(No. 10933.)

JAMES PRESCOTT *et al.* Appellees, *vs.* CHARLES AYERS *et al.* Appellants.

*Opinion filed December 21, 1916.*

1. WILLS—*verdict of a jury as to heirship in a will contest is merely advisory.* The question of heirship is not one upon which the parties are entitled to a jury trial in a proceeding to contest a will, and while it is proper for the chancellor to submit that question to the jury, the verdict, in that respect, is merely advisory, and it is the chancellor's duty to render such a decree as the law requires under the evidence.

2. SAME—*when child born in slavery is legitimate.* Under the act of 1891 (Hurd's Stat. 1916, p. 1695,) a child born in slavery must be regarded as a legitimate child, and therefore entitled to inherit and transmit by inheritance, where the slave marriage was never disaffirmed, but, on the contrary, was affirmed by cohabitation until the death of the wife.

3. SAME—*finding of the probate court as to heirship is merely prima facie evidence.* A finding of heirship in the order of the probate court admitting a will to probate is merely *prima facie* evidence as to such heirship, and in a proceeding to contest the will the parties may introduce any other legal evidence on that subject.

4. CONSTITUTIONAL LAW—*act of 1891, making children born in slavery legitimate, is not invalid.* The act of 1891, (Hurd's Stat. 1916, p. 1695,) making children born in slavery legitimate to the same extent as children of a lawful marriage, is not invalid upon the ground that the provision therein regarding the right to inherit is not within the subject of the act, as the making of such children legitimate renders the objectionable provision unnecessary.

5. The court reviews the evidence in this case, and holds it insufficient to sustain the verdict finding against the validity of the will on the issues of mental incapacity, fraud and undue influence.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

JAMES E. WHITE, (S. A. T. WATKINS, of counsel,) for appellants.

CHARLES A. WARD, (GEORGE W. ELLIS, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

From a decree of the circuit court of Cook county setting aside the will of Albert Covington, the defendants, who were the sole beneficiary and the executor of the will, appealed.

The contestants of the will were James Prescott, his son and six daughters, and the bill stated that James Prescott was the father and his son and daughters were the brother and sisters of the deceased and were his heirs. James Prescott died during the pendency of the suit and before a trial, and upon suggestion of his death the cause proceeded in the name of the remaining complainants.

The bill charged that the testator at the time of the execution of the will was not of sound mind and that its execution was procured through the fraud and undue influence of the defendant Charles Ayers, the sole beneficiary. The answer denied that the contestants were the father, brother and sisters of the deceased, and averred that they

were not related to him and had no interest in his estate. The answer also denied the allegation that the testator was of unsound mind and that the will was procured by fraud and undue influence. The chancellor directed issues of law to be made up as to whether the writing was the will of the testator, whether he was of sound mind when it was executed, and whether it was procured by fraud and undue influence. These issues were submitted to the jury, and it appears by the bill of exceptions that the question of the heirship of the complainants was tried at the same time, though no issue as to this question was formally made up. The verdict found the issues as to the will, the soundness of mind of the testator and the fraud and undue influence in favor of the contestants. It does not show any finding as to the heirship of the complainants, but the decree states that the jury found that Albert Covington was the son of James Prescott and the brother of his children and that they were the heirs of Albert Covington, and a decree was rendered setting aside the will. The question of the heirship was not one on which the parties were entitled to a trial by jury, but it was not improper for the chancellor to submit that question to the jury. The verdict was advisory, only, and it was the chancellor's duty to render such decree as the law required under the evidence. *Stone* v. *Salisbury,* 209 Ill. 56.

In regard to the relationship of the deceased to the contestants, the evidence consisted in large part of the declarations of James Prescott, the alleged father, which were testified to chiefly by his grand-daughter, the daughter of one of the contestants, though there were some minor statements testified to also by other witnesses. This evidence was received without objection. There was also evidence of some statements and acts of the deceased recognizing his relationship to the contestants. The deceased and all the parties to the suit were negroes, and the evidence tended to show that James Prescott and the mother of deceased were

slaves in Kentucky, who were there married in slavery and that the deceased was born of such marriage; that James Prescott was sold and separated from his wife and during the civil war entered the army; that after the war he found his wife and child in St. Louis; that his wife died and he married a second time, and that the contestants were the children of the second marriage. The objection is made to this evidence that the deceased having been born a slave could not inherit property and could have no collateral heirs; that he had no inheritable blood through which his property could descend to collaterals. By a statute passed in 1891 the legislature made the following enactment: "That all marriages that have been contracted wherein one or both of the parties were slaves at the time, shall be considered equally valid and binding as though the parties thereunto were free and the child or children of such marriages shall be deemed legitimate and placed upon exactly the same footing (as to the right to inherit property as well from their brothers, sisters and other relations as from their parents) as any child or children born of parents who were lawfully wedded and not slaves. The provisions of this act shall extend to all marriages entered into between such slaves, whether contracted and entered into within or without this State, so far as the right to inherit property within this State is concerned." (Hurd's Stat. 1916, p. 1695.) Under this statute, the slave marriage not having been disaffirmed, but, on the contrary, having been affirmed by cohabitation until the death of the wife, must be regarded as equally valid and binding as though the parties had been free, and the deceased must be regarded as a legitimate child. *Middleton v. Middleton,* 221 Ill. 623.

It is objected that so much of the statute quoted as declares that the children of such marriages shall be placed on the same footing as children born of parents who were lawfully wedded and not slaves, "as to the right to inherit property as well from their brothers, sisters and other rela-

tions as from their parents," is unconstitutional; that it includes a different subject from the remainder of the act, being on the subject of heirship and not of marriage. The words quoted are included in parenthesis in the body of the act, and the act would mean exactly the same thing if they were omitted. Marriage, the legitimacy of children and descent are all so closely connected that without the words quoted the necessary effect of an act declaring the marriage valid and the children legitimate is to give to the children the right to inherit from their brothers and sisters and collateral relatives.

The probate court of Cook county on March 8, 1915, made an order declaring the heirship in the estate of the deceased, finding that Albert Covington left surviving him a brother, John Covington, a sister, Lucy Garrison, and other unknown heirs, and it is insisted that no evidence was admissible to contradict this finding. The statute which provides for the making of such an order by the probate court also provides that it "shall be deemed and taken as *prima facie* evidence of such heirship: *Provided,* that any other legal mode of proving such heirship may be resorted to in any place or court where the question may arise by any party interested therein." (Hurd's Stat. 1916, sec. 3, p. 34.) The parties were therefore at liberty to introduce any other legal evidence on that issue.

The evidence was wholly insufficient to sustain the verdict as to the testator's mental incapacity and as to fraud and undue influence. The deceased had for a number of years lived in rooms over a saloon at the corner of Twenty-ninth and Dearborn streets. The will was executed there on December 28, 1914. The testator had been ill for some time and on the next day was taken to the Postgraduate Hospital, where he remained for about two weeks. He then went to the house of Bessie Hammond, one of the contestants, and after staying there two days went back to his home at Twenty-ninth and Dearborn streets, where he died

on February 21, 1915. The testimony having any tendency to show mental incapacity was given by Curley Davis and Clifford Green. Davis testified that he had known the testator for some time and was at his house as his nurse for about two weeks before the deceased went to the hospital, waiting on him and giving him medicine; that the deceased would talk like he was out of his head, jump up, and go to the window and say that his horses were freezing and they didn't have any blankets on them; that he would wake up and say, "Look at those fellows! They are going to take my money! I am not going to give it to them!" that the doctor would give him an injection and Davis would give him tablets and he would go to sleep; that the doctor called the morning the will was made, about half-past five or six o'clock; that Henry Thomas, who was a witness to the will, was there quite often; that Thomas talked to the deceased about making the will and told him he ought to make his will while he was feeling good, as he might drop off at any time, and the deceased said he would study over it—that he hadn't got quite ready to make it out yet; that Thomas came there on the day the will was made, with D. C. Smith, the executor, a lady, and George Eckton; that Thomas had a typewriting machine and asked Davis to get a table; that witness got the table and Thomas set the machine on it; that Thomas told Davis that the disinterested persons would have to get out of the room, and the deceased said, "That is all right; let Curley stay in;" that the door was left open and witness sat in front of the door; that defendant Charles Ayers was not there; that those present were Smith, Eckton, Thomas and the stenographer; that Smith commenced to ask the deceased about the will, and every time he said anything to Smith, Smith would say something to the lady and she would write it on the typewriting machine; that she had a paper in the machine and would pound on the typewriter; that they were there about an hour, and she used the typewriter until about five minutes

before they went out, when the paper was taken out of the machine and carried to the deceased's bed and he was told he would have to sign it; that he said he couldn't and some of them would have to sign it; that they said no, he would have to sign it.

Clifford Green testified that he was at the hospital when the deceased was brought there and that the deceased's bed was next to his; that the night he was brought there he jumped up and ran down the hall and the nurse brought him back; that the third night he had nine dollars, which the nurse asked him to take to the office, and he sent the nurse with it to the office; that that night he jumped up and went out into the hall and said somebody was trying to get his money, and the nurse brought him back; that the witness tried to talk with him and asked him about his work on the railroad, but he didn't seem to remember he was ever on the road; that one night he said the train had stopped at Fort Wayne, and said, "Let's get off;" that he did not act as though he could transact business at that time.

This was all the evidence tending to show any lack of mental capacity of the deceased at any time. Against it was the testimony of the two witnesses to the will, Miss Morgan, who wrote the will, Smith, the executor, who was present at the time, eight other witnesses who were well acquainted with the deceased and saw him more or less frequently about the time the will was made, his attending physician, and another physician who was called in consultation. Dr. McKenna was called to the deceased on December 5, 1914, and attended him continuously throughout the month. The deceased was suffering from a dilated heart and bronchitis. He did not seem to be irrational then or at any time when the doctor visited him. The disease he had would not affect his mind, and he seemed to be of sound mind on every visit the doctor made. The doctor was there on December 28, 1914, in the neighborhood of ten or eleven o'clock in the forenoon, and afterward saw him through

the month of January,—sometimes two or three times a week. During this time and on every visit that was made the doctor found him rational, and in his opinion the deceased was at all times rational and of sound mind and memory and could understand what business he was transacting and what he was doing.

Dr. Roche was called in by Dr. McKenna as a consulting physician about the middle or early part of January and made a complete examination of the deceased's condition. He found that he was very nervous and short of breath. He wanted the windows and door open for that reason. The doctor had him sit in a chair and he then seemed to be a little relieved. He could not give very much information then as to the history of his illness. He was very short of breath. He told the doctor that he had those spells off and on for quite a while and they were becoming serious. The doctor found his heart greatly enlarged and beating violently. His chest was in a condition of expansion most of the time. He was suffering from asthmatic attacks and could not get air and was suffering from a complication of the heart. The doctor came to the conclusion that his kidneys and his heart were failing as a result of his frequent asthmatic attacks, and the history the deceased gave him verified the diagnosis. The deceased had just come back from the hospital. At that time his mental capacity was poor during a spell of that kind, but when the attack passed away he felt much better and relieved and his mental condition was relieved until another attack came on. At that time he was suffering from the asthmatic attacks more than anything else. His talk was incoherent. The doctor could not call his condition stuporous. The most that bothered him was his breath and his excited mental condition. When that passed away his mind became normal again. The doctor's conclusion was that he realized his condition.

Henry Thomas and George F. Eckton were the subscribing witnesses to the will, which was written by Ver-

nie Morgan in their presence and in the presence of the testator and of D. C. Smith, who was the executor. Their version of what occurred differs from that of Curley Davis. They say that the will was written by Miss Morgan in her own handwriting, with pen and ink, in the forenoon; that there was no typewriter in the room; that the deceased was sitting in a chair and Miss Morgan sat beside him in a chair; that she wrote down what he told her to, and that he took the pen and signed the will himself. Charles Ayers was not there at the time the will was signed.

All these witnesses testify to the testator's clearness of mind, understanding of what he was doing and capacity to transact the business. The eight other witnesses all testified that the deceased was of sound mind up until the time of his death, giving the times and occasions of their meeting him and the circumstances on which their opinions were based. The overwhelming preponderance of the evidence is in favor of the ability of the testator to understand the business in which he was engaged. There is no evidence at all of undue influence.

It is argued that Ayers, the legatee, sustained a fiduciary relation to the deceased, but there is no evidence on which to base the argument. The nearest approach to it is the testimony of the witness Davis, who said that he did not know who took care of the business of Albert Covington,— Charlie Ayers, he guessed. Anthony G. Schachmuth testified that Bowers, Leibrandt & O'Brien, in whose real estate office the witness was general office assistant, had the renting and collection of rents of the deceased's property. This is the only evidence as to who attended to the deceased's business.

The evidence was wholly insufficient to sustain the verdict. The decree will be reversed and the cause remanded.

*Reversed and remanded.*