(No. 25101.— )

MARY FLYNN *et al.* Appellants, *vs.* HELEN TROESCH *et al.* Appellees.

*Opinion filed February 13, 1940—Rehearing denied April 3, 1940.*

276

WHITTY & McGAH, EUGENE P. KEALY, and THOMAS F. DONOVAN, (WILLIAM J. McGAH, CHARLES J. REED, TIMOTHY I. McKNIGHT, and OTTO W. BERG, of counsel,) for appellants.

IRWIN N. WALKER, THOMAS D. NASH, MICHAEL J. AHERN, and JOHN R. PORTER, for appellee Helen Troesch.

Mr. JUSTICE GUNN delivered the opinion of the court:

Appellants, Mary Flynn and Margaret Flynn, filed their suit in the circuit court of Cook county against Helen Troesch (hereinafter sometimes referred to as Helen Shanahan) to contest and set aside a will of David Shanahan, executed October 5, 1936, and, for further relief, prayed that a marriage claimed to have been celebrated on the same day between David Shanahan and Helen Shananan be declared void, because of mental incapacity on the part of David Shanahan. The complaint alleges that appellees and others conspired to procure said last will and to cause said marriage for the single purpose of obtaining possession and ownership of the estate of David Shanahan. Answer was made by Helen Shanahan, admitting the relationship of appellants to David Shanahan but denying all the other material averments of the complaint, and, further, that the deceased left no heirs surviving except Helen, his wife, and that the plaintiffs, as cousins, had no contestable interest that would permit them to file a will contest or proceeding. Upon motion of the defendant, the court entered an order severing the issue of the legality of the marriage from that of the legality of the will, and ordered the issue involving marriage to be tried separately before the court, and providing that if such issue was found for the plaintiff, immediately to proceed to try the issue involving the validity of the will·upon the evidence heard and any other evidence that might be presented. Before the day of trial, however, both parties stipulated, in writing, to try all issues before the court without a jury. At the conclusion of such trial, the circuit court found there had been a legal marriage celebrated between David Shanahan and Helen Shanahan and, under the law, she was the sole heir because the plaintiffs, as cousins, in such event, had no contestable interest, and entered a final decree dismissing the suit. The other defendants were beneficiaries of small bequests and neither

actively participated in the trial nor filed briefs in this court. Both personal property and real estate were devised by the contested will and the appeal comes directly to this court because a freehold is involved. *Barber* v. *Barber,* 368 Ill. 215.

Appellants claim that it was error for the circuit court to order a severance of the issues for the trial, on the theory that there was only one action—namely, a will contest— before the court. The allegations of the complaint not only charge an invalid will and a void marriage but the prayer for relief asks that the will be set aside and the marriage be declared null and void. Had only the will been set aside, the plaintiffs, as next of kin of the degree of cousins, would have taken nothing, as the marriage would not only have revoked the former will but left the surviving wife sole heir by the law of this State. In such a case, involving two material issues, the plaintiff was entitled to a jury trial only upon the will issue, but the other issue, of marriage, was triable by the court without a jury. The contention of the plaintiffs that the court was without authority to sever these two issues is without merit, as a careful reading of sections 44 and 51 of the Civil Practice act clearly indicates that an action involving materially different issues may be severed by the court and our rule No. 11 has recognized the principle by providing "equitable issues shall be heard and decided in the manner heretofore practiced in courts of equity." Such practice heretofore has been to try the question of heirship by the court and the validity of a will by a jury. *Orchardson* v. *Cofield,* 171 Ill. 14; *Gilmore* v. *Lee,* 237 id. 402; *Stone* v. *Salisbury,* 209 id. 56.

The fact that the complaint charged the appellee Helen Shanahan and others with a conspiracy that resulted in a marriage and the making of a will, either of which would deprive appellants of certain prospective benefits upon the death of Shanahan, and put the control and ownership of his property upon his death, in appellees, does not constitute a substantive cause of action which would result in

setting aside either transaction, since, if it should be shown that Shanahan was of sound mind, the acts would become his acts and not those of the alleged conspirators. In order to enable the plaintiffs to prevail, there must be a successful will contest and also a decree holding void the marriage between Helen and David Shanahan. The law provides that the first of these issues may be tried by a jury, the other by the court; they involve different characters of proof and may affect, differently, the competency of witnesses. The question in this case, however, is largely academic, because of a written stipulation to try both issues without a jury. Appellants were not deprived of a jury trial by the court but by their own stipulation, and are not in a position to complain of such action.

The principal discussion contained in the briefs is whether the decree was against the weight of the evidence. Where, from a consideration of the whole record, it appears the evidence does not justify the decree this court may reverse it. (*Johnson* v. *Lane,* 369 Ill. 135; *Burandt* v. *Burandt,* 318 id. 218; *Sharkey* v. *Sisson,* 310 id. 98.) As often stated, the general rule in equity cases is that great weight should be attached to the findings of the chancellor and they will not be reversed unless clearly against the weight of the evidence. *Beall* v. *Dingman,* 227 Ill. 294; *Zimmerman* v. *Zimmerman,* 242 id. 552; *Dalbey* v. *Hayes,* 267 id. 521.

David Shanahan was seventy-four years old and had been connected with politics for over forty years. He had been the Speaker of the House of the General Assembly for several terms, was a good business man, dealt in real estate and had amassed a considerable fortune. He had never married and his closest relatives, among whom were appellants, were first cousins. Appellee Helen Shanahan was forty-two years of age and had been employed in the office of the Secretary of State for many years. During sessions of the legislature she acted as stenographer and

secretary to Shanahan. For over twenty years a close friendship and feeling of mutual esteem existed between Shanahan and Helen and apparently between the latter and the members of Shanahan's family. Shanahan had hardening of the arteries (arterio sclerosis) for several years. In May, 1936, he had a heart attack (angina pectoris) which caused him to be taken to Mercy Hospital in Chicago on May 25, where he remained until his death on October 18, 1936. During this entire time he was under constant care of three well-known physicians and two trained nurses, and received the service of other hospital attendants such as floor-nurses, orderlies and internes, and was frequently visited by his relatives, business associates, friends and appellee. He was a Catholic and saw the priest in charge of the hospital chapel daily, and while in the hospital directed, or at least approved, transactions of business affecting his property. The charge of conspiracy in the complaint allowed a broader range of testimony than was perhaps authorized by the issues presented, so a great many acts and conversations of others appear in the record that have little bearing upon the true issues.

Upon October 5, 1936, David Shanahan and Helen Troesch were married by a Catholic priest, Father Moloney, in the presence of witnesses, and immediately afterward Shanahan executed a will making his wife sole devisee. The marriage and the will are both claimed to be void. In view of the large amount of testimony taken, a detailed examination of all the evidence bearing upon the contentions made by both parties is neither desirable nor necessary, other than for the purpose of determining whether the chancellor erred in entering a decree against the manifest weight of the evidence. With this object in view, the critical matters to be examined as material to the finding of the trial court are: First, the general nature and progress of the disease from which Shanahan was suffering; second, the facts relating to his mental capacity at the particular

time when the two contested events occurred; third, matters affecting the credibility of the several witnesses; and fourth, the conduct and relationship of the different parties before and at the time of the contested issues.

There seems to be no serious disagreement as to the nature of the disorder from which Shanahan suffered nor as to its physical and mental effect. There is testimony in the record supporting the proposition that hardening of the arteries throws an additional burden upon the heart which causes its muscles to weaken and thereby reduces the output of blood. When this happens, the lungs become congested and difficult breathing and stupor results; this condition is intermittent, dependent upon heart action, and is in direct relation to the quantity of blood circulating in the brain. This condition is known as cerebral aschemia and brings about a functional as distinguished from an organic change. When the heart condition becomes better the aschemia is relieved, which allows the brain to act normally. On the other hand, cerebral anemia brings about an organic change in the brain which may not be relieved when the cause is removed. The testimony of the attending physicians is that Shanahan did not have cerebral anemia but had cerebral aschemia during the attacks of angina pectoris. It also seems to be clear that arterio sclerosis, in itself, does not cause death, but is one of the causes of heart trouble by throwing an additional burden upon it. The disease from which Shanahan suffered is said to have followed a definite course depending upon the heart action. From May 25, until the first week of July, he suffered a number of heart attacks with frequent spells of difficult breathing and stupor. During this period of time he was very sick. From the early part of July, until about August 20, he was very much improved and was taken to the visiting room on the roof of the hospital where he talked with friends. He took several automobile rides and was apparently very much better. There seems to be no

claim that Shanahan was not competent to transact business during this period. Commencing the latter part of August, he again had serious heart attacks and consequent difficult breathing and stupor from which plaintiffs claim he never recovered but which defendants claim ended the latter part of September, when there was a decided change for the better, lasting until the ninth or tenth of October, after which he lapsed into his final illness. Defendants have designated the period from the latter part of September to October ninth or tenth as the fourth period, but plaintiffs contend that no fourth period ever occurred. A large part of the medical testimony, therefore, is centered on the mental and physical condition of Shanahan from about September 23 until October 9, 1936, with particular reference to his mental condition on October 5, when the acts complained of occurred. During the periods described in which he had heart attacks, he would frequently be in a stupor from which he could be aroused but would mumble, be incoherent in his speech and sometimes irrational. During the other period he would be like his ordinary self, would read papers, converse, sometimes ride around, meet visitors and apparently be in full possession of his mental faculties. It therefore appears from the record that the condition of Shanahan varied from time to time and makes it highly important to know his mental condition on October 5, 1936.

Two nurses attended Shanahan constantly, one on day and the other on night duty, and kept charts which contained notations of the patient's condition and medicines administered. It is contended these records are not competent evidence and, generally speaking, this is the rule, (*Wright* v. *Upson,* 303 Ill. 120, 144,) but there is no reason why they may not be used to test the credibility or accuracy of the testimony of the nurses making such notations, or the doctors, if it is shown that the doctors examined them at or shortly after they were made. Considered

for this purpose alone, they indicate an improvement of the condition of David Shanahan during the period of September 23 to October 8, as compared with his condition from August 18 to September 23. Some question has been raised as to the accuracy of these notations, but since both parties have made frequent reference to them, and they seem to reflect, in a general way, the course of the disease, they may be considered as throwing some light upon the subject. The testimony of the two nurses is in conflict in many important particulars, the day nurse claiming that Shanahan was rational and had mental capacity and the night nurse claiming that after September 4 he did not have mental capacity to transact ordinary business. While it is true the medical testimony indicates that the condition of a patient suffering from heart trouble is usually better in the day than at night, this alone would not explain this conflict in testimony. They were both confronted by different statements made at a former trial and many circumstances were testified to by other witnesses that conflicted with theirs. The trial court did not regard the testimony of either as convincing and in this respect we think it did not err.

This brings us to a consideration of the evidence of mental capacity of Shanahan at or about October 5, 1936. On October 5, and including the evening of the day, some fourteen or fifteen persons either saw or conversed with Shanahan. A majority of them testified without qualification that Shanahan, on said date, was in full possession of his mental faculties and able to transact any ordinary business. Father DeCelle, a Catholic priest in charge of the hospital chapel, saw him almost daily, and on October 3 had a long and intimate conversation with him about the proposed marriage and gave him communion on October 4, and on October 5, in the afternoon, congratulated Shanahan on his marriage. He relates other conversations which

would indicate mental soundness at this time. Father Moloney who performed the marriage had known Shanahan for many years and on October 3 procured from him the information from which he filled out a questionnaire required in the case of marriages between Catholics, in which he stated his age, religion, where he was baptized, in what parish he resided, the names and religion of his parents and certain other requirements of the church. When the marriage was performed, he recited the whole ceremony and Mr. and Mrs. Shanahan made the appropriate responses. The three regular physicians, Doctors Mandel, Sawyer and Fitzgerald, called that day and saw him, and he was also examined by Dr. Gonda who was called as an expert on certain features of the case. The three regular physicians testified to many conversations between themselves and Shanahan during the course of his illness. Misses Rogers and Mines and the day nurse, Miss Spiering, were present at the marriage ceremony and the witnessing of the will, and Jacob R. Sensibar, an old associate, saw him on the evening before and had a conversation with him. All these witnesses are positive in their belief that Shanahan was of sound mind at the times in question. The testimony of Messers Brinkman and Gordon, Mrs. Larkin and the night nurse, Miss White, is that at the time in question Shanahan did not have mental capacity. The testimony of two internes, Doctors Ulrich and Schoenwetter, is also to the effect that Shanahan was incompetent, but the opportunity of Dr. Ullrich for observation was not equal to that of the other witnesses and Schoenwetter was confronted with different statements made on the former trial. Of all these witnesses it is not indicated how the two priests, the three regular physicians, and Mines or Sensibar could possibly be interested in the result of this litigation or what motive they could have for deliberately testifying falsely. The priests and the doctors are members of honorable professions requiring men of the highest character and no cir-

cumstances have been proven which indicate that they were parties to a deliberate fraud.

There are many other circumstances that tend to show that the lapses of Shanahan into stupor and coma were occasional rather than continuous. For instance former Governor Emmerson had an hour's conversation with him about August 15, in which he describes a far different condition than that of the witness Brinkman, and on September 15 Burnet M. Chiperfield visited Shanahan, at which time he intelligently discussed the alleged possesion of certain of his property by appellant Mary Flynn, which would seem to indicate that even when he was in one of the worst phases of the disease he was able to converse intelligently about business.

Of those witnesses who saw and conversed with Shanahan frequently and who knew him well, the principal ones who dispute his mental ability are Brinkman, his former lawyer, Gordon, who handled his real estate, Costello, who was chauffeur for Gordon, the night nurse, Miss White, and some relatives by the name of Larkin. The testimony of the two nurses, Miss White and Miss Spiering, as pointed out above, cannot be considered with much confidence. Brinkman had acted as attorney for Shanahan and visited him nearly every day. He came to the hospital on May 28 when Shanahan asked him to look over a will he had executed the previous day. He had a heart attack this day and the next day was so sick that the last rites were administered by a priest. He discussed with Shanahan the question of income tax during the month of June, 1936, and settled the matter up for him. When he visited him during the months of July and August he says Shanahan had made childish remarks and in August, while riding with him in an automobile, he claims Shanahan did not say a single word although he later wrote a letter in which he said Shanahan enjoyed the ride very much. During the first week of August he told Shanahan about a lawsuit and was told to

take care of it. He says that from August 21 until his death, Shanahan appeared at all times to be in a semi-comatose condition.

The witness, Gordon, handled real estate matters and collected on mortgages and insurance for Shanahan. He, too, visited Shanahan frequently. In the early part of July, under a power of attorney he had obtained from Shanahan, he went to the office of a business associate of the latter, Jacob R. Sensibar, and procured the delivery of a safety box containing deeds, securities, etc., and delivered them to Mary Flynn; that during the month of August the only conversation that Shanahan made was just "Hello!" or "How are you?", and that Shanahan did not take much interest in anything that was said; that during the first two weeks in September he never initiated any conversation and that after September 29 he was in a coma and did not recognize anybody. The chauffeur, Costello, testifies substantially the same, except he does not testify so much in detail.

In addition to the foregoing, Mary E. Larkin, who was related to the deceased's brother's family, visited Shanahan frequently and was a sister to a beneficiary under the May, 1936, will, says that after August 20 Shanahan recognized her only once and that he did not recognize her husband or daughter, and that she saw him October 4 when he was in a stupor. Her husband and daughter did not testify, but it is stipulated they would have testified to the same.

Robert E. Rogers, a friend of long standing of Shanahan, visited him almost daily. He was the one who, at Shanahan's request, had the will of October 5 prepared, took it to the hospital and was one of the witnesses thereto. He was very friendly with appellee Helen Shanahan and was instrumental in procuring Sheridan, an attorney, to assist appellee in certain matters connected with Shanahan's property, hereafter pointed out. He and Sheridan procured the marriage license from the clerk's office and he made

several trips to see Judge Shurtleff at his home in Marengo, Illinois. He was a witness to the marriage and the will executed on October 5. He appears to have taken great interest in the whole matter from beginning to end and is charged as being one of the co-conspirators. He testifies that Shanahan gave him the directions for the different things that he performed for him and that he was of sound mind on October 5, although at previous times there had been occasions when he was in a stupor, but when the heart spells passed his mind became clear. The foregoing is substantially the testimony of the persons who visited Shanahan.

In addition to the foregoing witnesses there are a number of others who saw Shanahan occasionally at different times, whose opportunity for observation did not cover as wide a range, but whose testimony is material because of the manner in which it supports or contradicts the testimony of some of the principal witnesses. Spencer was a barber who shaved Shanahan frequently and says that during the early part of his illness he conversed with him a good deal but during the latter part of the time he was in a stupor, but he does not include the month of October as coming under his observation. He is of the opinion that Shanahan was incompetent the latter part of September. The witness, Byrne, was a patient in the hospital for several weeks on the same floor and occasionally went back and visited with Shanahan. He is apparently an honest and disinterested witness. He says that the condition of Shanahan during July and August was good and that in September it was bad, but the last day he saw him was September 26, 1936. The two nurses tending other patients on the same floor, Misses Downs and Pacquette, say that in the early part of his illness his mental condition was good but during the month of September it was bad, but neither one of them saw him after September 29, when their respective patients were discharged. On the other hand, two other nurses by the names of Riedle and O'Mara, observed different con-

ditions about the same time. Miss O'Mara says she talked to him on the afternoon of October 2 and that upon exchanging greetings he asked about Margaret Riedle who had been operated on; that he was of sound mind on that date but that he was decidedly bad later on in the month, October 10 or 11. Miss Riedle testified that she saw him on October 4, and stepped inside the door and spoke to him but that he was staring at the ceiling and she concluded that he was in a state of coma. Fred McCary, who was an orderly in the hospital, says that after September 20 Shanahan did not know anything at all, but it appears he made contrary statements and, in other ways, was somewhat discredited. Father O'Brien saw Shanahan once on September 30 for a few moments. Former Governor Emmerson visited Shanahan on August 15, and says that he was there an hour. Ex-Congressman Chiperfield relates a conversation about business matters on September 15, and of being directed by Shanahan to consult with Judge Shurtleff. He talked with him for forty-five minutes relating to property which he claimed Mary Flynn was withholding from him. In addition to the foregoing, there is the testimony of four doctors who testified as expert witnesses upon a hypothetical state of facts propounded by the plaintiffs. This statement did not include all of the facts testified to by both sides and did not cover all the matters proved by plaintiffs' witnesses and assumed that the hypothetical person involved was a man who had no lucid intervals after August 18 and whose brain was affected by disease to the extent he was incompetent. On cross-examination, their opinion was considerably modified when they were asked to assume additional facts, later proved by the defendant. Under these circumstances, necessarily not much weight was given to the expert testimony.

The acts of the parties and witnesses prior to Shanahan's going to the hospital have a direct relationship with the activities of some of the witnesses. Shanahan had made

a will in 1935 in which he gave Helen Troesch twenty per cent, Mary Flynn forty per cent and Margaret Flynn ten per cent of the residuary estate. In the will of May 27, 1936, the same proportions were given to Mary Flynn and Helen Troesch but that of Margaret Flynn raised from ten per cent to forty per cent. The specific bequests did not exceed $10,000. In 1935, he had $80,000, in cash, in a vault in the First National Bank of Chicago, which it appears was delivered to Mary Flynn in the presence of Brinkman and placed in another vault taken out in her name in the Northern Trust Safe Deposit Company, the rent of which was paid by Shanahan. An authorization card giving right of access to the box was given to Helen Troesch. In the early part of July, after Shanahan was taken to the hospital, Mary Flynn and Helen Troesch went in company to this box, the money was removed and taken by Mary Flynn and placed in a safety deposit box rented by her in the Palmer House. Helen wanted Mary Flynn to give a receipt or other evidence of possession. About this time Gordon, under the power of attorney he held, went to the office of Sensibar and obtained possession of Shanahan's box in his vault and delivered it and the contents to Mary Flynn. There is evidence tending to show Shanahan was informed of these moves and was very much disturbed and intimated that he was being robbed. Helen Shanahan knew that she was a beneficiary under the earlier will but, apparently, Rogers had given out the information that she was excluded from the will made in the hospital as the record discloses she wrote a letter about it to Mary Flynn, asking her for information which the latter declined to give. It also appears Helen had gone to both Brinkman and Gordon and endeavored to have them procure receipts from Mary Flynn for the property she had in her possession. Brinkman attempts to explain the delivery of the $80,000 to Mary Flynn as a gift in which Helen Troesch had a twenty per cent interest but that matter, as we understand

it, is now in controvery in another proceeding. It is at this stage that Sheridan was employed. Helen Shanahan, failing to get a receipt through Brinkman or Gordon, enlisted Rogers, who recommended to her Sheridan, a lawyer who represented her thereafter in various ways for several weeks and in company with her called several times upon the late Judge Shurtleff of Marengo. Sheridan, after the death of Shanahan, filed a suit for her against Mary and Margaret Flynn to require an accounting of the property received by them which is still pending although the property has been deposited in court waiting final decree. Sheridan made no claim of professional privilege and is the witness most relied upon to establish the alleged conspiracy between appellee and others to bring about a marriage. His testimony is disputed in most material facts by the other witnesses with whom he had conversations, namely, Father Moloney, Father DeCelle, Doctors Sawyer, Fitgerald and Rodgers, Judge Shurtleff being dead and Helen Shanahan being unable to testify. The trial court gave very little if any weight to his testimony and in this respect we can not say it erred. As Brinkman and Gordon were at that time representatives of Shanahan, their assisting in or at least having knowledge of this transaction must be considered in weighing their testimony and determining their interest in the case. It does not appear that Brinkman ever advised Shanahan of what took place, and a violent quarrel took place in Shanahan's room between Rogers and Gordon over his part in this transaction. We cannot say that the deceased did not have a right to be disturbed over what had occurred. There is other evidence in the record that tends to show that the mental condition of Shanahan, during the latter part of September and the early part of October, is neither as continuous nor as severe as these two men testify. The court took all these circumstances into consideration and gave special weight to the testimony of witnesses who appeared to be disinterested, candid and

frank in their statements. In *Dalbey* v. *Hays, supra,* this court said: "We do not attach any importance to the number of witnesses called, alone, but are inclined to regard as important the credit given their testimony by the trial court, which saw and heard them testify and was better able than this court to judge of the credibility of each." The trial judge was in the best position to determine the weight to be given the various witnesses.

The relationship between David Shanahan and Helen Shanahan prior to the marriage and execution of the will is material in considering the evidence on the issues involved. David Shanahan had known Helen for over twenty years. He frequently wrote her cards and many letters showing high esteem. It is true they were not couched in the fervid language that might be expected of a young admirer but they do reflect the highest regard for her. The evidence tends to show that he was very careful in the expenditure of money and yet he bought for her an automobile, gave her a ring, paid her hospital bill when she was very sick and at that time advised her with all earnestness to be very careful that she remained until completely well without regard to expense. He gave her access to his safety deposit box in the bank in Chicago, without regard to the fact she lived in Springfield, Illinois. This was not unknown to his relatives as she was authorized to act in conjunction with Mary Flynn. She frequently visited in Chicago and was taken to dinners and entertainments by him. She is mentioned as a substantial beneficiary in all the wills appearing in the record and named as co-executrix in all previous wills. He was generous in the help of her relatives, it appearing that he had financed the education of two of her brothers for the priesthood. On the other hand, there is no proof in the record that at any time David Shanahan ever lacked or lost confidence in Helen Shanahan. There is no evidence of any improper conduct or that her actions were not honest and sincere and nothing has been

shown in the record that makes any act testified to inconsistent with the interest of David Shanahan. The fact that she wrote to Mary Flynn desiring to know the contents of the will of May 27, was no doubt partly prompted by the statement made by Rogers that she had been excluded, but the same letter indicates she was not only familiar with but intended to do all she could to carry out certain expressed wishes of Shanahan. Brinkman and Mary Flynn both knew she was one of the beneficiaries in this will and one of the executrices and their failure to give her any such information or to give any acknowledgment or inventory of the property in the possession of Mary Flynn seems unusual, if not strange, under the circumstances. The trial court expressed no doubt that Shanahan, for years, had been willing and anxious to marry Helen. The objection came on her part, not from a lack of esteem but from the great disparity in their ages. After Shanahan learned the money and securities were in the hands of Mary Flynn he consulted with some of his old friends, particularly Judge Shurtleff and ex-Congressman Chiperfield and whether he sent for them himself or they were called by Helen Shanahan is not material as the immediate purpose was clearly to protect Shanahan. The inference is strong that these men knew Shanahan desired to marry Helen and were urging Helen to waive her conscientious scruples and, by marriage with Shanahan, not only relieve him of his worry but be in a position to protect his property. It is suggested by appellants that the marriage was solely for the purpose of acquiring possession of the property and while we do not believe this is shown, still, if it were true, it neither proved nor disproved the mental capacity of David Shanahan to enter into a marriage on October 5.

In *Hagenson* v. *Hagenson,* 258 Ill. 197, we held that the same mental strength necessary to the transaction of business is not necessary to enable the party to contract a marriage, though he must be capable of understanding the

nature of the act, and sustained the marriage. In that case decedent was suffering from the same character of disease and the death occurred shortly afterwards. Under like conditions, a will was sustained in the case of *Prescott* v. *Ayers,* 276 Ill. 242. Each case must stand, however, upon the particular facts applying to it. The evidence in this case conclusively shows that a marriage was performed by a proper person under a license duly and legally issued. When the celebration of a marriage is once shown, the contract of marriage, the capacity of the parties and in fact everything necessary to the validity of the marriage, in the absence of proof to the contrary, will be presumed. (*Cartwright* v. *McGowan,* 121 Ill. 388; *Johnson* v. *Johnson,* 114 id. 611; *Potter* v. *Clapp,* 203 id. 592.) The burden of proof was upon appellants to show the marriage was invalid. The trial court saw and heard the witnesses upon this issue and was in a better position to judge of their credibility and interest. After a careful consideration of the record we are convinced the trial court committed no error in finding the marriage valid, and the decree is accordingly affirmed.

*Decree affirmed.*