(No. 35692.—

J. W. GREATHOUSE *et al.*, Appellants, *vs.* IRA VOSBURGH *et al.*, Appellees.

*Opinion filed May 18, 1960—Rehearing denied September 26, 1960.*

Hershey, J., took no part.

JAMES C. CRAVEN, of Springfield, for appellants.

GIFFIN, WINNING, LINDER & NEWKIRK, of Springfield, (ALFRED F. NEWKIRK, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Plaintiffs appeal directly to this court from a decree of the circuit court of Sangamon County dismissing for want of equity a suit to set aside a marriage, a will, and several deeds, on the alleged grounds of lack of mental capacity, undue influence, influence of stupefying drugs, and other reasons. A freehold being directly in issue, this appeal is properly brought direct to this court.

Proceedings on count II of the complaint to set aside the marriage and the deeds were heard by the master in chancery, who made a report finding in favor of the defendant Vosburgh, and recommending dismissal of the suit for want of equity. This phase of the case was heard by the chancellor on exceptions to the master's report.

By stipulation of the parties, proceedings were had on count I of the complaint to set aside the will by submitting to the chancellor for decision those parts of the evidence taken by the master which would be competent in the face of objection.

Myrtle Vosburgh, hereinafter referred to as Myrtle, married the defendant Ira Vosburgh on September 20, 1956. One of the deeds in question was executed by Myrtle to Ira Vosburgh in fee simple on August 23, 1956. The other deeds in question were executed on September 21, 1956, and October 5, 1956, placing certain property owned by Myrtle prior to her marriage, in the names of Myrtle and Ira Vosburgh, husband and wife, as joint tenants. On October 5, 1956, the will in question was executed by Myrtle leaving everything to her husband, Ira Vosburgh. Myrtle died on January 10, 1957, at the age of 72 years, with an estate valued in excess of $100,000, consisting of

both real and personal property, and leaving her surviving no child or children, or descendants of deceased children, but leaving the plaintiffs and the defendant Hill, who were her brothers and sisters or lineal descendants of deceased brothers or sisters, and the defendant Ira Vosburgh, alleged surviving spouse, as her sole and only heirs-at-law. At the time of Myrtle's death the defendant Ira Vosburgh was 42 years of age.

Plaintiff's principal contention on this appeal is that Myrtle did not have mental capacity to enter into a valid marriage contract and to execute a valid deed or will, that there was a breach of fiduciary relationship and undue influence of the part of the defendant Ira Vosburgh, and that the decree of the circuit court is against the manifest weight of the evidence.

To resolve the issues in this case, it is necessary to state the facts as reflected in the testimony and evidence. Many of the facts are undisputed and will be stated substantially in chronological order, after which the testimony of the various witnesses as to mental capacity will be considered.

Myrtle, during the lifetime of her previous husband, Fred Wienold, and subsequent to his death in 1947, had acquired a substantial amount of real estate in Springfield, Illinois, an undivided interest in a farm near Flora, Illinois, and certain personal property. One of the properties was a grocery store in Springfield, next door to a barber shop where Ira Vosburgh was employed. During the lifetime of Myrtle's former husband, the defendant Vosburgh, a bachelor, became acquainted with Mr. and Mrs. Wienold. They became good friends and this friendship with Myrtle continued after the death of Wienold.

In May of 1948 Myrtle developed cancer of the rectum and a colostomy was performed at that time. In May of 1954 she developed some bladder trouble and ulceration in her scar but nothing further until June of 1955 when the

doctor noticed some shadows in her chest. In November of 1955 she developed difficulties in her chest and in February of 1956 Dr. Stocker diagnosed her difficulty as cancer of the carina, which is at the point of the trachea where it divides into the bronchi of the two lungs, which cancer was inoperable. A frank discussion was had with the patient and she was informed of her general condition. Starting in November of 1955 she had begun taking codeine thorazine for the pain in her buttocks, and by June of 1956 the pain was severe enough to require hypodermic injections of demerol, a synthetic narcotic.

In July, 1956, Myrtle was desirous of going home from the hospital, and Dr. Graham, her attending physician, was willing for her to do so provided arrangements could be made for someone to give her the necessary injections. Defendant Vosburgh had had experience in giving his mother shots for diabetes during her lifetime. Arrangements were made whereby Myrtle would go home and Vosburgh would look after her and give her shots as required. Thereafter Vosburgh took care of administering her shots and, commencing late in August, he began taking care of her by taking care of the cooking and cleaning and assisting her to care for her property.

Some time during the year, 1954, Myrtle herself broached the subject of marriage to Vosburgh but nothing definite was decided at that time. They continued to go around together and from time to time visited both his relatives and friends and her relatives and friends.

Commencing about a year prior to her marriage to Vosburgh Myrtle began using Charles C. McBrian, an attorney and a justice of the peace, as her lawyer. During the year preceding the marriage she was in his office at least a half dozen times. He made out landlord's notices, handled the sale of some farm land and drew at least three wills for her before any of the transactions which are the subject matter of this lawsuit occurred. He also drew and

witnessed the will in question, drafted a power of attorney, drafted, took the acknowledgment and recorded all of the deeds in question, and performed the marriage ceremony between the parties.

Prior to August 23, 1956, Myrtle informed McBrian of her intention of making a gift of some property on Cook Street to Ira Vosburgh and requested him to draw the deed, giving him the necessary information as to description, *etc*. He prepared this deed, which was executed by her on August 23, 1956, before McBrian as notary, and he took care of the recording of the instrument. About the same time Myrtle requested McBrian to draft a general power of attorney authorizing Ira Vosburgh to handle business matters for her. This power of attorney was prepared by McBrian and was executed on August 27, 1956, at Mrytle's home and acknowledged before McBrian's private secretary.

Three or four weeks before the marriage, Myrtle came to McBrian's office and, in private, discussed the proposed marriage with him stating that she realized the discrepancy in their ages but that she was ill and was afraid that she would become helpless and that her relatives would put her in a home but that she knew that Ira Vosburgh would take care of her. She also discussed the marriage with him by telephone. When the date of the marriage was set, Myrtle called McBrian and made the arrangements and also arranged for Vosburgh to pick him up and bring him to her home for the ceremony which was performed about 3:00 P.M. in the presence of Henry Offer and his wife. Following the marriage ceremony refreshments of cake and coffee were served in the kitchen.

Prior to September 21, 1956, Myrtle had McBrian prepare certain deeds to other real estate owned by her, so as to place the title in herself and Ira Vosburgh as husband and wife and as joint tenants. The necessary information

for the deeds was given to McBrian by Myrtle herself and he prepared the necessary deeds to convey the property to his secretary and then back to Myrtle and Ira Vosburgh, husband and wife, as joint tenants, which deeds were executed by both Myrtle and Ira at their home on September 21, 1956, before McBrian as notary, who took care of the recording of the same.

Prior to October 5, 1956, Myrtle again requested McBrian to prepare additional deeds conveying the balance of her real estate, except her interest in the Flora farm, to herself and Ira as joint tenants, herself furnishing the necessary information to McBrian. He prepared these deeds in like manner as the prior deeds and they were executed on October 5, 1956, before McBrian as notary and he caused them to be recorded.

Prior to October 5, 1956, Myrtle also requested McBrian to prepare her will leaving everything to her husband, Ira Vosburgh. McBrian so prepared the will and he, accompanied by Roy Hill, another Springfield attorney who had an office with McBrian for over twenty years, took the will to Myrtle's home where it was handed to Myrtle and she read it over. McBrian then asked her if it was the way she wanted it and she replied that it was and requested McBrian and Hill to act as witnesses. The will was then executed by Myrtle and witnessed by McBrian and Roy Hill. At the time of execution of the will Ira Vosburgh was in the house and in and out of the room but neither of the witnesses to the will was able to testify whether or not he was in the room at the time the will was executed. Vosburgh himself testified that at the time he was in the kitchen and not in the presence of Myrtle.

Prior to the events above related, McBrian had done legal work for Ira Vosburgh, and had once represented Ira's sister. He is the attorney for Ira Vosburgh as executor of the estate of Myrtle Vosburgh, deceased, and since the death

of Myrtle has handled a lease matter and written a letter for Ira concerning farm income. He does not represent Ira in the present litigation.

Proof was made that between July 9, 1956, and October 1, 1956, 14 vials each containing 30 ccs. of demerol, a synthetic narcotic for the relief of pain, were dispensed to Myrtle, plus 36 tablets of cod-empiral containing a half grain each of codeine. At 2 ccs. per injection, this quantity would provide 210 shots of demerol. Vosburgh still retains 1¾ vials which would administer approximately 26 shots, leaving 184 shots which were administered to Myrtle. During this period Myrtle was in the hospital a total of 29 days. Thus between July 9, 1956, and October 5, 1956, the date the last instrument in question was executed, there were sixty days in which injections were administered to Myrtle at home. One hundred eighty-four shots administered over sixty days would average slightly over three shots per day.

There is no direct evidence that Myrtle was under the influence of any drug at the exact time of any of the events which are the subject matter of this lawsuit. Ira Vosburgh positively testified that the last medication to Myrtle before her marriage on September 20, 1956, was the night of September 19; that the last medication given before the execution of the deeds on September 21, 1956, was before daylight on that day; that the last medication before the execution of the deed on August 23, 1956, was the night before and that the last medication before the execution of deeds and will on October 5 was the night before.

Plaintiffs called eight witnesses, one of whom, a pharmacist, merely testified as to the quantity of demerol sold to Myrtle. Of the remaining seven witnesses, four (J. W. Greathouse, Eartha Schultz, Susan Corrie, and Gerald Hill) were parties to the suit and incompetent to testify on the will contest issue.

Greathouse testified to the fact of Myrtle visiting him

in Oklahoma for three days in May of 1956, during which time she appeared to be sick and in pain and to be taking pills, and his visiting her in Springfield from September 5 to September 14, 1956, during which time she was in bed most of the time and during which time Vosburgh gave her injections of demerol four or five times per day during daylight hours. He testified that when she took a shot she would lie down, shut her eyes for about an hour and a half and when she woke up she would be in a sort of a daze and say nothing for about fifteen minutes. He also discussed the nature of their conversations but he was neither asked for nor gave any opinions as to Myrtle's mental capacity.

Eartha Schultz, Myrtle's sister, testified that a month or so before the wedding Myrtle visited her in Flora and told her that Ira wanted to marry her, that Ira asked her if she was ever going to marry him, saying he was the man for her, but that Myrtle had said that he got drunk and kept her friends from her and that he was no man for Myrtle. On cross-examination the witness admitted that at no time had Ira ever kept her from visiting privately with her sister, at no time had she ever seen Ira drunk, and that he took care of Myrtle as heretofore indicated. The witness was neither asked for nor gave any opinion as to mental capacity.

Susan Corrie, Myrtle's niece, testified that in a conversation with Ira Vosburgh in July, 1956, he told her that Myrtle was losing her mind and going crazy (which conversation was denied by Vosburgh), that Myrtle suffered a great deal of pain and when she took a shot she would seem to be stupified, and on the basis of some other contacts testified that in her opinion Myrtle was not always mentally able to transact her business due to stupifying drugs. On cross-examination, the witness admitted that the only times in which her aunt was incompetent to transact ordinary business was just before a shot, at which time

she was in intense pain, and just after a shot, when she would be stupified, or if something upset her. She further testified that her aunt would be able to discuss business matters on a good day and admitted accepting a $500 check as a gift from Myrtle on November 15, 1956, at which time the witness considered Myrtle to be of sound mind.

Gerald Hill, Myrtle's nephew, testified that he was at Myrtle's home for one-half hour on Saturday night, September 22, 1956, two days after the wedding and one day after certain deeds were executed, with other people present in the room, that there was casual and desultory conversation, that Myrtle was not as talkative as she ordinarily had been, and that in his opinion on that occasion she was mentally incompetent to transact ordinary business. On cross-examination the witness further stated that he would still say that she was mentally incompetent to transact ordinary business even if, after September 22, 1956, Myrtle was able to go to the grocery store, select her groceries, sign her name to checks, collect rents, arrange for repairs to property and give gifts to a church.

Edward Hill, father of Gerald Hill, testified that on September 13, 1956, he went to Myrtle's home and visited for about an hour, that Myrtle was in a house dress, had lost a lot of weight, was not well and did not converse with him, limiting the conversation to saying "Hello" and how she felt. She did recognize him and knew who he was. He testified that in his opinion she lacked mental capacity to transact ordinary business on that date.

Mary Hill, the stepmother of Gerald Hill, testified much the same as her husband, Edward, on the basis of a visit with Myrtle on September 12 and on September 13, 1956.

Plaintiffs also called Dr. James J. Graham, Myrtle's attending physician from the time of the colostomy in 1948 up until her death. He testified as to the nature of her

ailment, that the effect of demerol was to ease pain and to give a person a brighter outlook on life, which was both because of the freedom from pain and because of the nature of the narcotic, that with a single 2 cc. dose of demoral, with no prior doses within four to six hours, a person would be able to transact ordinary business but that with a second dose within thirty minutes of the first dose such person would not be able to transact ordinary business for four to six hours. The doctor saw the patient daily between August 1 and August 20, 1956, on September 14 and 15, and daily from November 14, 1956, until her death. He gave as his opinion that on each and every occasion on which he saw Myrtle up until December 17, 1956, plus or minus one week, she was at all times capable of transacting ordinary business and that at no time prior to December 10, 1956, did he observe any condition of her mentality which would have prevented her from transacting ordinary business.

The defendant called a number of witnesses. McBrian, Myrtle's attorney, testified in detail as to his various conferences and conversations with Myrtle and the circumstances surrounding the execution of the deeds and will and performance of the marriage ceremony as hereinbefore set forth. He gave, as his opinion, that at all times on which he saw Myrtle and specifically during each and all of the events which are the subject matter of this lawsuit, Myrtle was of sound mind and capable of transacting ordinary business, and that he never saw any evidence of her taking or being under the influence of any drugs.

Roy Hill, another practicing lawyer of Springfield associated in McBrian's office, who had known Myrtle for many years and who had seen her in McBrian's office and had talked with her by telephone and who had witnessed a previous will and was a witness to the will in question, testified that in his opinion on each and all of the occasions she was

of sound mind and capable of transacting ordinary business, and that he saw no evidence of her being under the influence of drugs.

The secretary to McBrian and Roy Hill testified to the same opinion on the basis of her participation in the preparation of the power of attorney, the deeds and wills.

Mrs. Henry Offer, who, with her husband Henry, had been a witness to the marriage ceremony, testified that she was in Myrtle's presence before, during and after the marriage ceremony and that Myrtle appeared perfectly rational and that she saw no evidence that Myrtle was taking any medicine. In her opinion Myrtle was of sound mind and capable of transacting ordinary business at the time of her marriage. Witness's husband, Henry Offer, died pending the lawsuit and was not available to testify.

The deputy county clerk of Sangamon County who issued the marriage license to Myrtle and Vosburgh on the morning of September 20, 1956, and obtained certain information from Myrtle in respect thereto, testified that in his opinion she was, on that day, of sound mind and capable of transacting ordinary business and also testified that Myrtle, at that time, told him she was afraid that if she became helpless her relatives would try to put her in a home where she did not want to go and that she was marrying Ira so he would take care of her.

Dr. Lando, also consulted by Myrtle in January and February of 1956, confirmed the diagnosis of cancer. He also gave her premarital blood tests on August 28 and September 17, 1956, and treated her for a finger condition in November. He testified that, in his opinion, at all times he had seen her, Myrtle was of sound mind and capable of transacting ordinary business. He also testified that at the time of premarital examination Myrtle told him in private that she did not have to marry Ira but that she wanted him to have all of her property and that by marrying him she could be sure that he would get it.

The defendant also called an insurance broker, a carpenter, a contractor, an operator of a grocery store, a filling station operator, a neighbor, a sister, an aunt, and an uncle of Ira Vosburgh, all of whom testified to numerous facts and transactions, both of a business nature and of a social nature, together with conversations, some of which occurred before and some after the dates in issue in this case.

The defendant Ira Vosburgh was called by the plaintiffs to testify under section 60 of the Civil Practice Act. He corroborated the testimony of the other defense witnesses and further stated that at no time up to a couple of days before her death was Myrtle ever of insufficient mental capacity to transact ordinary business.

Defendants also had introduced in evidence a lease of property made by Myrtle on October 1, 1956, a deed dated September 21, 1956, by which Myrtle transferred title to some cemetery lots to both of their names, an advance contract for funeral arrangements made by Myrtle, and 28 cancelled checks covering the entire period in question, 8 of which were completely made out and signed by Myrtle and the rest of which were made out by someone else but signed by Myrtle.

Although the briefs of counsel have variously described this marriage as "unnatural" or "uncommon," we believe that the marriage is more properly generally described as a marriage between a wealthy 72-year-old widow dying of cancer and a 42-year-old man who had been a family friend, who had lived in her home prior to the marriage, who had administered narcotics to her upon a doctor's prescription and recommendation, who had performed duties for her under a general power of attorney prepared by her attorney at her request, and who had consulted with her on various business matters.

Although various cases cited by counsel and examined by the court indicate the existence of a difference in tests for competency between one entering into a marriage, one

executing a will, and one conveying real estate by deed, all of such authorities agree that a person who has sufficient mental capacity to transact ordinary business has mental capacity to perform all three of the aforesaid acts, and that was the test adopted and followed by both sides in the presentation of their evidence and will be followed by this court. *Flynn* v. *Troesch*, 373 Ill. 275, as to marriage; *Lucas* v. *Westray*, 408 Ill. 243, as to deeds; and *Shevlin* v. *Jackson*, 5 Ill.2d 43, as to wills.

It is likewise recognized by counsel for both sides that where a marriage is shown the law raises a presumption of its validity, and the burden is upon the objecting party to prove its invalidity, (*Flynn* v. *Troesch*, 373 Ill. 275,) and also that the presumption is that the grantor of a deed was of sound mind, and the burden of showing that he was mentally incapable is upon the complaining party. *Johnson* v. *Lane*, 369 Ill. 135.

Since the principal discussion contained in the briefs is whether the decree of the trial court was against the manifest weight of the evidence, we must also keep in mind the principle that this court may reverse a decree where, from a consideration of the whole record, it appears that the evidence does not justify such a decision, but, as a general rule in equity cases, great weight should be attached to the findings of the chancellor and they will not be reversed unless clearly against the weight of the evidence. (*Flynn* v. *Troesch*, 373 Ill. 275.) As we indicated in *Mitchell* v. *Van Scoyk*, 1 Ill.2d 160, in considering a similar argument, this court will not reverse the judgment of the trial court where the evidence of the successful parties, considered by itself, is clearly sufficient to sustain the verdict. Considering all of the evidence in this case in the light of the foregoing rules, we cannot say that the findings of the trial court as to the mental competency of Myrtle Vosburgh to enter into the questioned marriage, and to execute the questioned deeds and will, were con-

trary to the manifest weight of the evidence or that the testimony offered by the defendants is insufficient to support such findings. Dr. Graham, the attending physician for the decedent, and called as a witness by the plaintiffs, positively testified that on each and every occasion on which he saw the deceased up until at least December 10, 1956, she was of sound mind and of such mental capacity as to transact ordinary business. The doctor's testimony further indicated that in his opinion she was capable of transacting ordinary business even under adverse circumstances, on the assumption that she would be relied on only for the decisions and that she would have people who would help her. Two of plaintiffs' other witnesses did not give an opinion as to her mental capacity and three were of the opinion that the deceased lacked mental capacity on certain specific dates, none of which were the dates on which the acts in question occurred. Neither of those three witnesses were present upon any of the occasions in question. The other witnesses of plaintiffs limited their expression of opinion of lack of mental capacity to saying that the deceased was not always capable of transacting ordinary business, thereby referring to the times immediately before or immediately after the decedent had had a narcotic administered to her.

The defendant produced sixteen witnesses, including the defendant himself, each of whom expressed an opinion that Myrtle was capable of transacting ordinary business at all relevant times. Included among these witnesses of the defendant was another of Myrtle's attending physicians; her attorney with whom she had consulted concerning the marriage, who had performed the marriage as a justice of the peace, and who had prepared the various deeds and wills at her direction; the clerk who issued the marriage license; the friend and matron of honor who was a witness at the wedding; another lawyer who acted as a witness to the will; the lawyer's secretary who prepared the deeds and

the will; and an insurance agent, contractor, carpenter, grocer, and service station attendant, with all of whom she transacted ordinary business. In addition, cancelled checks of the decedent in payment of personal and business expenses during a period covering the events in question were introduced in evidence, at least eight of which were made out in their entirety by the decedent.

From the foregoing facts it appears to us that there are only two elements from which the validity of the marriage might be questioned and those are the discrepancy in the ages of the parties to the marriage and the fact that the deceased was suffering a terminal illness from an incurable cancer at the time of the marriage. Both of these elements were present and presented to the court in the case of *Flynn* v. *Troesch,* 373 Ill. 275. The facts in such case are in many respects similar to the facts here presented. In the *Flynn case,* David Shanahan, a former Speaker of the House of Representatives of the State of Illinois, aged 74, and a patient in the hospital as the result of several heart attacks, suffering from arteriosclerosis and cerebral aschemia which caused periodic stupor, married his secretary, aged 42, and on the same day executed his will leaving everything to her. Thirteen days later he died. On the suit contesting the validity of the marriage and the will, the testimony was conflicting as to his mental capacity and it was established that he had periods of coma and periods of lucidity. After reciting the substance of the evidence in that case at length, the trial court noted the suggestion by the appellants that the marriage was solely *for the purpose of acquiring possession of the property* and stated that while it did not believe that such was shown, still if it were true, such purpose and intention neither proved nor disproved the mental capacity of David Shanahan to enter into the marriage. After citing the holding of this court in *Hagenson* v. *Hagenson,* 258 Ill. 197, in which a marriage was sustained where a decedent was

suffering from disease or illness at the time of the marriage and death occurred shortly after the marriage, and the case of *Prescott* v. *Ayers,* 276 Ill. 242, where a will was sustained under like circumstances, and also noting that each case must stand upon the particular facts applying to it, this court held that the trial court committed no error in finding the marriage valid.

Plaintiffs rely to a great extent on the decisions of this court in *Mitchell* v. *Van Scoyk,* 1 Ill.2d 160, and *Orchardson* v. *Cofield,* 171 Ill. 14. In support of their position, in the *Van Scoyk case* this court affirmed the trial court's decree setting aside a certain will and codicil of Samuel James, deceased, which decree was entered upon a verdict of a jury. In that case we stated at page 172: "This court has said that the active agency of the chief beneficiary in procuring a will especially, in the absence of those having equal claim on the bounty of the testator, who was enfeebled by age and disease, is a circumstance indicating the probable exercise of undue influence. In that connection we have observed that a mind wearied and debilitated by long-continued and serious illness is susceptible to undue influence and liable to be imposed upon by fraud and misrepresentation; that the feebler the mind of the testator, no matter from what cause, whether from sickness or otherwise, the less evidence will be required to invalidate the will of such person."

From such proposition plaintiffs argue that the defendant Ira Vosburgh, as a fiduciary, was the dominant party in whose behalf the will was drawn and was directly connected with the making of the will, and that thereby a presumption of invalidity is established as a matter of law, which presumption the defendant has failed to overcome.

In the *Van Scoyk case,* upon a second trial before a jury, the issues were found against the validity of the will both upon the question of mental competence and undue influence. The evidence in the case showed that the testator

lacked only one month of being 92 years of age on the date the will was executed, was feeble and entirely bed-ridden at the time, failed to recognize his friends, had transacted no business of his own for a considerable time before the execution of the will, and when talked to appeared to be "perfectly at sea." The chief beneficiaries in the testator's will were his sister and a party not related to the testator, the testator's only daughter being cut off by the will. The testator had lived with his sister for several years and the sister had handled all of his business for him for two years before his death. The sister refused to let his relatives and friends in to see him, deliberately lied to him about what his daughter had done and was trying to do in a conservator's proceeding instituted by the daughter, selected and hired a lawyer to defend the testator in the conservator's proceeding in which he evidenced no interest, hired a lawyer to prepare the will in question and was present during all of the discussion as to the contents of the will and actively participated in such discussion, obtained her own friends to witness it, and was present during its execution.

Although we are of the opinion that the statement quoted from the *Van Scoyk case* is a proper statement and that we properly affirmed the trial court in that case on the ground that the verdict was not manifestly against the weight of the evidence, we do not believe that such statement, applied to the facts of this case, requires a reversal of the trial court's decree as being contrary to the manifest weight of the evidence in this case. The evidence of the defendant in this case, considered by itself, is clearly sufficient to sustain the decree, just as the evidence of the successful party in the *Van Scoyk case* was clearly sufficient to sustain the verdict. A presumption of undue influence in the execution of a will arises not from the fact of a fiduciary relationship, or of the mental condition or habits of the testator, but from the participation by the

fiduciary in actually procuring the execution of the will. *Sterling* v. *Dubin*, 6 Ill.2d 64; *Lake* v. *Seiffert*, 410 Ill. 444; *Powell* v. *Weld*, 410 Ill. 198.

Although in this case Ira Vosburgh bore a fiduciary relationship to the decedent, there was ample affirmative evidence, not only by the defendant himself but by the attorney for the decedent, negating his participation in procuring the execution of the will, and it appears to be the voluntary act of the testatrix.

To establish undue influence it was incumbent upon the plaintiffs to prove not only the fiduciary relationship but participation in procuring the execution of the will, which would give rise to the presumption of the exercise of undue influence.

As to the case of *Orchardson* v. *Cofield*, 171 Ill. 14, a wealthy 85-year-old widow married a man 57 years of age at a time when she was afflicted with cancer and her physical health was very poor. The cancer and pain had caused her mind and memory to become weakened, and, among other things, she was a believer in spiritualism and was suffering the insane delusions that Orchardson had superhuman powers and attributes and that the spirit of her dead husband dictated and approved of the marriage. As a matter of fact, the testatrix was a woman of very refined tastes and her moral senses were unperverted, disapproving of immorality, intemperance and other like sins, and her prior husband had been of like character, whereas Orchardson was a person of doubtful background, was given to debaucheries and associations with lewd women and was of a character which under ordinary circumstances would have repelled the testatrix from coming in contact with him. Orchardson, in that case, had come to town only a few months prior to the marriage and after inquiring about the testatrix had divorced his own wife and set out upon a studied campaign to prey upon the testatrix's belief in spiritualism and to get her money. The facts in that case

clearly show both fraud and insanity as the operative forces behind the decree. None of the facts in this case would indicate either fraud or insanity and, in our opinion, the *Orchardson case* is not persuasive in the decision of the instant case.

We have also considered the various other authorities cited by the plaintiff. None of them alter the fact that the evidence in this case clearly was sufficient to sustain the decision of the trial court. Accordingly, the trial court's decree must be affirmed.

*Decree affirmed.*

Mr. JUSTICE HERSHEY took no part in the consideration or decision of this case.