Sidney F. Larson, Plaintiff-Appellant, v. Myrtle Larson, Defendant-Appellee.

Gen. No. 11,736.

Second District, Second Division.

September 5, 1963.

Knight, Ingrassia & Roszkowski, of Rockford, for appellant.

Eugene R. Pigatti, of Rockford, for appellee.

CROW, PJ.

This is an appeal by the plaintiff, Sidney F. Larson, from a decree dismissing a suit for want of equity on a complaint for annulment of a marriage between the plaintiff and the defendant, Myrtle Larson. The complaint, so far as material, alleged that a marriage was entered into between the plaintiff and the defendant in Sycamore, Illinois, on March 21, 1950; at the time of the marriage and for some time prior thereto, the defendant was and continues to be of unsound mind, so as to be incapable of understanding a contract of marriage; and soon after the marriage the defendant was committed to Elgin State Hospital and still is a

patient there. After the defendant was served with summons a guardian ad litem was appointed for her, who filed an answer demanding strict proof and defended the suit.

The plaintiff urges that the decree is contrary to the manifest weight of the evidence and is contrary to the law.

It is the theory of the defendant that the statute relied upon by the plaintiff, Ill Rev Stats 1953, c 89, § 2, a part of the Marriage Act, as amended, did not become effective in its amended form until January 1, 1952, and that in its amended form it has no effect on the marriage in this case between the plaintiff and the defendant since the marriage took place on March 21, 1950, and that there is no sufficient, clear, and convincing evidence that the defendant was insane at the time of the marriage.

■ Prior to 1951, and at the time of this marriage, March 21, 1950, Section 2 of the Marriage Act, Ill Rev Stats 1949, c 89, § 2, provided:

"No insane person or idiot shall be capable of contracting marriage."

This section was amended by an Act approved July 16, 1951, effective January 1, 1952, so as to provide, as amended, Ill Rev Stats 1951, c 89, § 2:

"No insane or mentally ill person or idiot shall be capable of contracting marriage."

The marriage here having taken place on March 21, 1950, the statute as amended in 1951, effective January 1, 1952, is not applicable. The statute as it existed prior to that amendment, Ill Rev Stats 1949, c 89, § 2, is applicable. The question, therefore, is—Was the defendant an "insane person," or legally capable of entering into the marriage relationship on March 21, 1950 under the statute and law as it then existed. There is no contention she was an "idiot."

469

The pertinent evidence offered by the plaintiff disclosed that the plaintiff was 48 years of age and the defendant 39 years of age on March 21, 1950, the date of the marriage. The plaintiff had known the defendant for about two years, but had known her well for only about one month before the marriage. During that period he noticed nothing abnormal about her. He knew nothing of her having any mental disability, if she had any. A few months after the marriage the defendant once in a while thought police officers were watching her, although they were not. During the following months she thought the house was wired with electricity from which she was receiving electric shocks, but the house was not so wired. In the middle of the night sometimes she thought she heard people running around on the roof and around the house, but there were no people on the roof or around the house. In the nighttime on one occasion she ran to a neighbor's house where she was not known, and the police brought her home. The plaintiff thought it was a nervous condition. She ran away a second time. She was then committed to Elgin State Hospital for treatment on July 22, 1952, by the Winnebago County Court as a mentally ill person, incapable of managing and caring for her own estate. She was there about four months. Subsequently, on March 17, 1954, the County Court of Winnebago County, on the defendant's petition, found that she had recovered from her mental illness and was capable of caring for her own estate and restored her to all her civil rights. The plaintiff said she got along good for awhile. But, on November 9, 1956, she was again committed by the County Court of Winnebago County to the Elgin State Hospital, again as a mentally ill person. During the time between the first discharge and the second commitment, March 17, 1954 and November 9, 1956, she accused the plaintiff of having women around, when

he did not, and sometimes said the police were watching her. Sometimes when the plaintiff came home from work she chased him with a broom. Once she locked him out of the house. The defendant had previously been married to another party and had been divorced by him on the ground of desertion in 1942. The plaintiff lived with the defendant as husband and wife until she was committed to the Hospital in 1952, and thereafter whenever she was at intervals permitted to come home on week-ends, and again after she was restored in 1954 and until the second commitment in 1956, and again thereafter when she was at times given conditional discharges on week-ends at home.

Dr. Curt Steffen, called as a witness on behalf of the plaintiff, testified that he was a physician and surgeon specializing in mental disorders. He had never personally examined or treated Mrs. Larson. She was diagnosed by some other doctor or doctors as a schizophrenic (apparently at the time of the 1952 or 1956 commitments), and, from an hypothetical question which took certain evidentiary facts into account alleged to have taken place before and after her marriage, he said all of her symptoms appeared to be schizophrenic symptoms, persecution ideas, delusions, and depressions. Such a psychosis usually starts earlier in life than 39 years of age he said. With this type of psychosis, he said, patients have so-called lucid intervals. Those intervals may last for months or even for years and then they go gack into depression or insanity. Very few schizophrenics are cured, he said. They may be discharged from a hospital but after a time they have attacks again and have to be recommitted. He said he would assume she had been mentally sick for quite a while but she might not have had such outspoken symptoms that a layman would be able to recognize such as insanity. She might be

all right for two years—a layman's cure. Outspoken symptoms usually come on very gradually. During the cross-examination, the doctor was asked:

"Q. Then is it your opinion, Doctor, that a schizophrenic can never be cured?
"A. I would say—I wouldn't say never, but I would say it is a rarity if they can ever cure a schizophrenic completely.
"Q. Then is it your opinion a schizophrenic is in the way of medically always insane?
"A. One doesn't have to be insane. There are a lot of symptoms between sanity and insanity, and you cannot just say sane and insane. It might be legally all right, but medically it is very difficult to say."

A brother of the defendant's first husband (from whom she was divorced in 1942, 8 years before the present marriage) said that while she was married to his brother she would about once a year just flare up, not talk to anyone, and run off and leave her family. He said she just didn't act normally. Once after she was married to the plaintiff Larson this witness said she came to the witness' home and accused his oldest son of improprieties towards her,—that was in 1958. He said at one Christmas time she was good one day and not the next. He had no trouble with her.

It is this medical testimony and the other evidence referred to that the plaintiff insists is sufficient evidence of insanity of the defendant on March 21, 1950 to justify decreeing an annulment of the marriage.

When the celebration of a marriage is shown, the contract of marriage, the capacity of the parties, and, in fact, everything necessary to the validity of the marriage, in the absence of proof to the contrary, will be presumed; the burden of proof was

472

■

upon the plaintiff to show the marriage was invalid; to enable a party legally to contract a marriage he or she must be capable of understanding the nature of the act: Flynn v. Troesch (1940) 373 Ill 275, 26 NE2d 91. When a marriage is shown the law raises a strong presumption in favor of its validity, and the burden is upon the party objecting thereto to prove such facts and circumstances as necessarily establish its invalidity; there is no clear dividing line between competency and incompetency, and each case must be judged by its own peculiar facts; the parties must have sufficient mental capacity to enter into the status, but proof of lack of mental capacity must be clear and definite; if the party possesses sufficient mental capacity to understand the nature, effect, duties, and obligations of the marriage contract into which he or she is entering, the marriage contract is binding, as long as they are otherwise legally competent to enter into the relation: Ertel v. Ertel (1942) 313 Ill App 326, 40 NE2d 85. A marriage contract will be invalidated by the want of consent of capable persons; it requires the mutual consent of two persons of sound mind, and if at the time one is mentally incapable of giving an intelligent consent to what is done, with an understanding of the obligations assumed, the solemnization is a mere idle ceremony,—they must be capable of entering understandingly into the relation: Hagenson v. Hagenson et al. (1913) 258 Ill 197, 101 NE 606. It is impossible to prescribe a definite rule by which the mental condition as to sanity or insanity in regard to a marriage can in every case be tested; the question is not altogether of brain quantity or quality in the abstract, but whether the mind could and did act rationally regarding the precise thing in contemplation,—marriage,—and the particular marriage in dispute,—not whether his or her conduct was wise, but whether it proceeded from a

mind sane as respects the particular thing done: Cf. Orchardson v. Cofield (1897) 171 Ill 14, 147 NE 197; Cf. Pyott v. Pyott (1899) 90 Ill App 210.

 The decree here is not contrary to the manifest weight of the evidence or to the law. Prior to and at the time of the marriage the plaintiff noticed nothing abnormal about the defendant. There is no evidence that any of the unusual things she thought and did some months after the marriage had also occurred prior to and at the time of the marriage. Her first commitment to Elgin State Hospital was in 1952, more than two years after the marriage. In 1954 she was found to have recovered and was restored to all her civil rights. She got along good for awhile thereafter. Her second commitment was in 1956, more than four and one-half years after the marriage. The plaintiff continued to live regularly with the defendant as husband and wife except for such times as she was actually physically confined at the Hospital. The doctor who testified had never examined, or treated the defendant and his entire testimony is based, necessarily, on an hypothetical question. The ostensible diagnosis was evidently made by another or other doctors, who were not available or did not testify here. No doctor, nurse, or attendant at the Hospital who might have observed, examined, or treated her testified. In this doctor's opinion, even, a patient of that type may have lucid intervals for months or years,—she may not have had any symptoms which a layman would recognize as insanity,—she might be all right for years,—and he would not say a patient of such type could never be cured. Even he said such a patient might be legally all right,—not legally insane,—though medically it may be very difficult to say. The other witness' testimony was either quite remote in point of time, or related to an incident eight years after the marriage, or had to do with matters having no great legal significance.

The plaintiff has not satisfied the burden of proving, clearly and definitely, that the defendant was an "insane person" at the particular time of this marriage, March 21, 1950,—that she was at that time incapable of understanding the nature of the act, that she had insufficient mental capacity to enter into the status and understood the nature, effect, duties, and obligations of the marriage contract, that she was mentally incapable of giving an intelligent, understanding consent, or that her mind could not and did not act rationally regarding the precise thing in contemplation, marriage, and this particular marriage in dispute.

The decree is correct and it will be affirmed.

Affirmed.

SPIVEY and WRIGHT, JJ, concur.