**2022 IL 126956**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126956)

*In re* ESTATE OF JOHN W. McDONALD III, Deceased (Shawn McDonald, Appellant v. Ellizzette McDonald, Appellee).

*Opinion filed April 21, 2022.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Neville, and Michael J. Burke concurred in the judgment and opinion.

Justice Theis concurred in part and dissented in part, with opinion, joined by Justices Overstreet and Carter.

**OPINION**

¶ 1     The issue in this appeal is whether Ellizzette McDonald, also known as Ellizzette Duvall Minnicelli (Ellizzette), sufficiently established that she is the

surviving spouse of John W. McDonald III (John) and, as such, the sole heir of his estate.

¶ 2		On November 18, 2019, trial was held in Kane County circuit court on Ellizzette's claim of heirship. Ellizzette, *pro se*, presented the testimony of three witnesses in an effort to establish that, on July 11, 2017, she entered into a legally valid marriage with John, who died intestate, on December 11, 2017. At the conclusion of Ellizzette's case, Shawn McDonald (Shawn), as the appointed administrator of John's estate, moved for a directed finding, which the circuit court granted. The court held that Ellizzette failed to present a *prima facie* case establishing the validity of her marriage to John.

¶ 3		Ellizzette appealed, and the Appellate Court, Second District, affirmed in part, reversed in part, and remanded for further proceedings. 2020 IL App (2d) 191113. The appellate court held that a new trial was necessary because the circuit court erred when it barred Ellizzette from testifying based on the Dead Man's Act. 735 ILCS 5/8-201 (West 2016).

¶ 4		Shawn filed a petition for leave to appeal in this court, which we granted. For the reasons that follow, we now reverse the appellate court judgment and affirm the circuit court's judgment.

¶ 5		BACKGROUND

¶ 6		On December 15, 2017, Shawn McDonald filed a petition in the circuit court of Kane County, seeking letters of administration for the estate of his deceased brother, John W. McDonald III, who died intestate on December 11, 2017, in Paris, Illinois. Attached to the petition was an affidavit of heirship, in which Shawn averred that John's estate consisted of approximately $225,000 in personal property and that John's only heirs were his parents, John W. McDonald Jr. and Brenda K. McDonald, and his siblings, Heather Ladue (sister), Shawn McDonald (brother), and Brett McDonald (brother). Shawn further averred that on May 30, 2017, he had been appointed plenary guardian over John's person and estate by the circuit court of Kane County and that thereafter, on July 11, 2017, without the prior knowledge or consent of his guardian or the court, John participated in a purported wedding ceremony with a person who identified herself as Ellizzette Duvall Minnicelli.

- 2 -

Shawn alleged that this marriage was without legal effect and void *ab initio* because John, as a ward, lacked the legal capacity to consent to the marriage without a judicial finding that the marriage was in John's best interest. On December 19, 2017, the circuit court entered orders appointing Shawn administrator and declaring John's heirs to be John Jr., Brenda, Heather, Shawn, and Brett.

¶ 7        On December 22, 2017, Shawn filed a petition for declaration of invalidity of marriage pursuant to section 301(1) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), which provides:

"The court shall enter its judgment declaring the invalidity of a marriage (formerly known as annulment) entered into under the following circumstances:

(1) a party lacked capacity to consent to the marriage at the time the marriage was solemnized, either because of mental incapacity or infirmity or because of the influence of alcohol, drugs or other incapacitating substances, or a party was induced to enter into a marriage by force or duress or by fraud involving the essentials of marriage[.]" 750 ILCS 5/301(1) (West 2016).

¶ 8        In support of his petition, Shawn attached an affidavit in which he averred that on May 30, 2017, he had been appointed by the circuit court of Kane County to serve as plenary guardian of John's person and estate. Shawn further averred that during a contested guardianship hearing on November 16, 2017, he learned for the first time that John had participated in a purported marriage ceremony on July 11, 2017, and that John entered into this marriage without the prior knowledge or consent of his guardian (Shawn) or the court.

¶ 9        Attached to Shawn's affidavit were various documents considered by the guardianship court, including a physician's report from Dr. Ramon A. Gonzales. Dr. Gonzales reported that John had been diagnosed with "bipolar disorder with manic and depressive episodes" and that John suffered from "alcohol use disorder (severe)." According to Dr. Gonzales, John's bipolar disorder, which "by its own nature impair[ed] his ability to make reasonable and safe decisions," coupled with John's refusal to comply with prescribed treatment, meant that John was "at a high risk of being hurt by others due to his behavior, or to hurt himself, besides not being able to manage his financial affairs at this time."

¶ 10        Shawn also provided a report from Fred J. Beer, who served as John's guardian *ad litem* (GAL) in the 2017 guardianship proceedings, which the guardianship court also considered. Beer reported that, based on his conversations with John and several members of John's family, John had been a neurologist but he had not practiced for the last four years. Beer also reported that John suffered from bipolar disorder, alcoholism, and drug addiction; that John had been in rehabilitation at least three times, each completed unsuccessfully; and that John had twice attempted suicide by taking pills and alcohol. Beer noted that John, when in a manic state, spent money recklessly and irrationally. For example, Beer reported that John had a habit of purchasing expensive jewelry and gifts only to give them away to total strangers. In the three years prior to the guardianship hearings, John had frivolously spent approximately $600,000. John's family members described John as "out of control" and a "king manipulator." Based on his investigation, Beer advised the court that he concurred with the doctor's recommendation that guardianship was in John's best interest.

¶ 11        Based on the above information, the guardianship court found that John was a disabled person in need of guardianship, as defined in the Probate Act of 1975 (Probate Act) (755 ILCS 5/1-1 *et seq.* (West 2016)), and appointed Shawn as John's plenary guardian. The record indicates that, after Shawn's appointment, John filed a motion to vacate the guardianship order. Although the court denied John's motion at a hearing on July 6, 2017, the court appointed independent counsel for John, to assist him in seeking the termination of Shawn's guardianship. In addition, the court ordered John to appear at Alexian Brothers Hospital on Monday, July 10, 2017, for further evaluation. Subsequently, John, through his counsel, filed a petition to terminate Shawn's guardianship. Proceedings on this petition were ongoing until John's death on December 11, 2017.

¶ 12        In addition to the above documents and court orders, Shawn attached, to his petition to declare the marriage invalid, a photocopy of what purported to be a certified marriage certificate for John Wood McDonald III and Ellizzette Duvall Minnicelli, issued on July 17, 2017. It indicated that the marriage took place in Paris, Illinois, on July 11, 2017, with Raymond Carl Bement as the officiant. No witnesses were listed on the certificate.

¶ 13 On January 3, 2018, Shawn filed a petition to recover assets, seeking an order requiring Ellizzette to turn over to the estate John's cremains,[1] as well as various personal items including John's cell phone and laptop computer. It was alleged that, shortly after John's death and without the knowledge of John's family, Ellizzette took possession of John's body and authorized its cremation "in order to prevent any further investigation into the cause of [John's] death."[2]

¶ 14 In response to Shawn's petition, counsel entered an appearance on behalf of "Ellizzette McDonald" on January 4, 2018, and moved for a substitution of judge as a matter of right. That motion was granted, and on January 17, 2018, Ellizzette filed a motion to vacate the court's orders appointing Shawn administrator of John's estate and declaring heirship. Ellizzette asserted that she was John's surviving spouse and, as such, his sole heir. Ellizzette further asserted that Shawn, having been aware that she was John's surviving spouse, had obtained letters of administration under false pretenses. Ellizzette maintained that the orders granting Shawn letters of administration and declaring heirship were void for want of personal jurisdiction because Shawn failed to comply with the mandatory requirements of sections 9-4 and 9-5(a) of the Probate Act (*id.* §§ 9-4, 9-5(a)), failed to include a necessary party (her), and wrongfully excluded her as John's heir. In the alternative, Ellizzette also filed a motion to reconsider and modify the orders.

¶ 15 On February 1, 2018, Ellizzette filed a response to Shawn's petition for declaration of invalidity of marriage, denying that John lacked the capacity to marry. Ellizzette offered no evidence to support her claim that the marriage was legally valid. Rather, she asserted that Shawn had engaged in a "years-long extensive, improper and unjustified pattern and practice of attempting to wrongfully seize control of John's assets and otherwise harass John and Ellizzette," as evidenced by Shawn's "unwarranted and unjustified procurement of guardianship over John."

---

[1]More than a year later, at a hearing on May 1, 2019, Ellizzette testified that she scattered John's ashes in Lake Michigan and that no one accompanied her to witness this event.

[2]On January 31, Shawn also sought a court order to require MNS Labs to turn over to the estate a sample of John's blood that was in its possession. According to the motion, the blood sample had been taken following John's death and remained in storage at MNS Labs after testing. It was alleged that the sample would advance the estate's investigation into John's death, which Ellizzette had concealed from John's family. That motion was later granted over Ellizzette's objection.

¶ 16    On March 7, 2018, Shawn voluntarily withdrew his petition for declaration of invalidity of marriage. On the same day, Shawn filed his response to Ellizzette's motion to vacate his appointment as administrator, asserting that, although Ellizzette may have participated in a marriage ceremony with John, John lacked the capacity to enter into a legally valid marriage contract because he was a ward subject to plenary guardianship. In support of this position, Shawn cited sections 11a-17(a-10) and 11a-22(b) of the Probate Act (*id.* §§ 11-17(a-10), 11a-22(b)). Section 11a-22(b) provides that

> "[e]very note, bill, bond or other contract by any person for whom a plenary guardian has been appointed or who is adjudged to be unable to so contract is void against that person and his estate, but a person making a contract with the person so adjudged is bound thereby." *Id.* § 11a-22(b).

Shawn asserted that marriage is a contract and, pursuant to section 11a-22(b), the marriage contract entered into by John and Ellizzette on July 11, 2017, was void and the marriage invalid, affording Ellizzette no rights regarding the estate.

¶ 17    Ellizzette replied, asserting that section 11a-22(b) of the Probate Act was inapplicable to a marriage contract. She contended that the validity of a marriage is governed by section 301 of the Marriage Act (750 ILCS 5/301 (West 2016)). Further, she argued that a challenge could not be made to the validity of the marriage since John was deceased and section 302(b) of the Marriage Act provides: "In no event may a declaration of invalidity of marriage be sought after the death of either party to the marriage under subsections (1), (2) and (3) of Section 301." *Id.* § 302(b).

¶ 18    On March 20, 2018, counsel for Shawn issued a "Notice of Deposition to Ellizzette McDonald ('Ellizzette')" and on April 19, 2018, Shawn filed a petition for a citation to discover and recover information and/or assets under section 16-1 of the Probate Act. 755 ILCS 5/16-1 (2016).

¶ 19    After a hearing on April 18, 2018, the court denied Ellizzette's motion to vacate the order appointing Shawn administrator but granted her leave to file a petition seeking letters of administration and an affidavit of heirship based on her assertion that she is John's surviving spouse and sole heir. Ellizzette filed that petition on May 1, 2018.

¶ 20        On May 17, 2018, Shawn filed a response to Ellizzette's petition, along with a "Request to Admit Facts and Genuineness of Documents" in which Shawn sought documentation from Ellizzette regarding her identity, including birth records, marriage and divorce records, documentation of any official name changes, and an admission that a birth certificate for Lisa Anne Blaydes was, in fact, her birth certificate.

¶ 21        Ellizzette did not appear for a deposition, nor did she respond to any of the requests to admit facts and provide discovery. As a result, on June 5, 2018, Shawn filed a motion to compel discovery. Two days later, on June 7, 2018, Ellizzette filed a motion for judgment on the pleadings regarding her petition for letters of administration. In addition, Ellizzette sought a protective order to stay discovery pending the resolution of her motion for judgment on the pleadings. The motion to stay discovery was denied on June 13, 2018, and the court ordered Ellizzette's counsel to respond to Shawn's request to admit facts and to produce Ellizzette for deposition. Nevertheless, Ellizzette failed to appear for two scheduled depositions—on July 19 and 25, 2018. Under threat of sanctions, Ellizzette appeared for a deposition on August 22, 2018.

¶ 22        At the deposition, Ellizzette was shown copies of a marriage license application, marriage license, and marriage certificate, each listing Ellizzette Duvall Minnicelli as the bride. In addition, each of these documents indicated that Ellizzette Duvall Minnicelli was born in Lyon, France, on March 21, 1964, and that she was a "physician scientist." Throughout discovery and at the deposition, Ellizzette failed to produce any documents to verify the information contained in these documents, nor did she establish her identity as Ellizzette Duvall Minnicelli. When Ellizzette was shown a birth certificate and other documents suggesting that Ellizzette was born Lisa Anne Blaydes on March 21, 1963 (one year earlier than stated in the marriage documents), in Maine Township, Cook County, Illinois, she refused to acknowledge that this was her birth certificate. She admitted that she had been known by other names and produced the following: an employment verification letter indicating that Lisa Blaydes-Zollner (SS# ***-**-1769) worked as a student employee at the University of Illinois at Chicago for various periods between 1985 and 1993; two United States passports, one issued November 23, 1999/expiring November 22, 2009, and a second one issued April 11, 2013/expiring July 10, 2013, as well as an undated Social Security card (***-**-1769), and an Australian

driver's license (expiration date June 25, 2012), all issued in the name Ellizzette Blaydes Duvall; a social security card (***-**-1769) issued August 2, 2010, in the name Ellizzette Anne Mareen Minnicelli; an "interim Medicare card" expiring July 24, 2013, issued in the name Ellizzette B. Minnicelli; a passport issued July 3, 2013/expiring July 2, 2023, in the name Ellizzette Duvall; an Illinois driver's license dated April 25, 2013/expiring March 21, 2018, issued in the name Ellizzette Duvall Minnicelli; an undated Social Security card (***-**-1769) issued to and signed by Ellizzette A.M. Duvall; an Illinois driver's license dated July 18, 2017/expiring March 21, 2018, issued in the name Ellizzette Duvall McDonald; and a Social Security card dated September 8, 2017, issued in the name Ellizzette Anne Mareen McDonald. No evidence of marriages, divorces, or applications for name changes were provided.

¶ 23        After deposing Ellizzette, Shawn filed a response to the motion for judgment on the pleadings on August 28, 2018. He argued that there were disputed issues of fact. In support, Shawn attached portions of the deposition transcripts of Anthony Scifo and Ellizzette. Scifo, who had been the attorney representing John in the contested guardianship proceedings, testified that he advised John that he could not marry because he had been declared a ward of the court. In addition, Scifo testified that he had discussed, with both John and Ellizzette, the probability that any marriage, if it took place, would be found invalid. Ellizzette confirmed in her deposition that Scifo had advised both her and John, prior to their wedding, that their marriage might not be valid.

¶ 24        On September 6, 2018, Shawn petitioned the court for an order requiring Ellizzette to submit to fingerprinting so her identity could be established. In support, Shawn alleged that, at her deposition, Ellizzette admitted she had used many names yet provided no explanation for the various name changes. In addition, when shown a copy of the birth certificate for Lisa Ann Blaydes, who was born in Illinois and not Lyon, France, Ellizzette claimed she "didn't know" if it was her birth certificate but produced no birth certificate for "Ellizzette Duvall Minnicelli."

¶ 25        After a hearing on September 10, 2018, the court denied Ellizzette's motion for judgment on the pleadings. Also, following a hearing on September 18, 2018, the court ruled that Ellizzette would be required to submit to fingerprinting if she continued to pursue her petition to be named administrator of the estate. The court

held that, if Ellizzette amended her petition to seek the appointment of someone other than herself as administrator, she need not submit to fingerprinting.

¶ 26 On October 2, 2018, Shawn filed a motion asking the court to take judicial notice of John and Ellizzette's certificate of marriage, marriage license, and application for marriage license. In these documents, Ellizzette attested that her name was Ellizzette Duvall Minnicelli, that her last name on her birth certificate was "Duvall," that she was born in Lyon, France, that she had one prior marriage, and that her occupation was "physician scientist." On November 6, 2018, Ellizzette objected to Shawn's motion, stating that the documents contained "assertions of purported fact which may be subject to reasonable dispute at trial."

¶ 27 Prior to a ruling on that motion, on October 22, 2018, Ellizzette moved the court to enter "a Rule 218 Scheduling Order to set deadlines for discovery and dispositive motion deadlines, as well as a trial date on [her] Petition for Letters, to bring the central controversy in this matter to a final adjudication." Shawn responded on October 24, stating, "by Ellizzette filing her Motion for Supreme Court Rule 218 Scheduling Order, she has made clear that she wishes to pursue her petition to have herself appointed as administrator pursuant to the Probate Act of 1975. 755 ILCS 5/28-1, *et seq.*" As a result, Shawn moved the court to require Ellizzette to submit to fingerprinting.

¶ 28 On November 30, 2018, the court, *inter alia*, granted Shawn's motion to take judicial notice of the marriage documents over Ellizzette's objection and set a case management schedule, requiring that all discovery be completed by September 30, 2019. The court also ordered Ellizzette to present herself at the Kane County Sheriff's Office within 60 days for fingerprinting. The record shows that, after three attempts to obtain Ellizzette's fingerprints, no usable prints were ever acquired.

¶ 29 Subsequently, on January 29, 2019, the court ruled that certain answers by Ellizzette to Shawn's request to admit facts would be deemed admitted without qualification and ordered Ellizzette to amend other answers found to be nonresponsive. The court also ordered Ellizzette to turn over John's iPhone and laptop to the estate within 14 days and issued a protective order to preserve the electronically stored information (ESI) on these devices. The court granted Ellizzette's combined motion for subpoenas to obtain John's medical records and a qualified order pursuant to the Health Insurance Portability and Accountability Act

of 1996 (Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code)), subject to *in camera* review by the court.

¶ 30    On February 11, 2019, Ellizzette's counsel moved for leave to withdraw as Ellizzette's counsel, which the court granted on February 15, 2019. Ellizzette was allowed 21 days to find a new attorney and substitute appearance.

¶ 31    In the interim, on February 13, 2019, Shawn filed a request that the court take judicial notice of a Doximity[3] file on an account for Ellizzette Duvall, who represented herself as an academic neurosurgeon affiliated with New York-Presbyterian Hospital's department of neurosurgery. The file contained information regarding an investigation Doximity conducted into Ellizzette's account. According to Doximity's findings, Ellizzette's professional profile could not be substantiated and, therefore, her account was deemed a fake. Notably, in response to a request from Doximity for verification of her credentials, Ellizzette provided a picture identification card for "Ellizzette Duvall" from two medical institutions in New York. Ellizzette's only other response was an assertion that Shawn had instigated the inquiry into her professional credentials and that she had sought an order of protection from Shawn on November 17, 2017, in Edgar County, Illinois. Ellizzette attached an unsigned copy of an emergency order of protection against Shawn on behalf of Ellizzette and John. In the petition for an order of protection, Ellizzette alleged that Shawn took marital property from certain storage units and sold it; harassed her and John by contacting businesses, hospitals, and their colleagues; and "assumed John's identity" to change passwords, redirect John's mail, and stop bank cards. Ellizzette also contended that Shawn physically abused and stalked her and John and that Shawn made repeated calls to the police for "health checks" on John, alleging that John was an alcoholic and dangerous. It appears from the record that on March 19, 2019, the court deferred ruling on this motion to take judicial notice. However, there is no further discussion or ruling on the motion found in the record.

¶ 32    On March 18, 2019, Ellizzette filed her appearance *pro se*, along with a motion to extend time for filing responses, which the court granted. Then, on April 10,

---

[3]Doximity is an online networking service for medical professionals.

2019, Ellizzette's previous counsel filed a new appearance on her behalf, only to file another motion to withdraw five months later, on September 12, 2019. The court granted the second motion to withdraw on September 18, 2019.

¶ 33    In August 2019, Shawn moved the court to take judicial notice of court records indicating that, on November 26, 2001, felony charges were brought against Ellizzette Duvall, also known as Lisa Blaydes, in New York state for falsifying business records, unauthorized use of professional title, and forgery, based on Ellizzette misrepresenting herself as a doctor between September 12 and September 15, 2001, in the New York State Army National Guard Volunteer Registration Log. Ellizzette pled guilty to misdemeanor forgery and was sentenced to three years' probation. At a hearing on October 23, 2019, the court granted the motion, taking judicial notice of the New York state court documents, subject to their relevance at trial.

¶ 34    On October 16, 2019, Shawn filed a motion *in limine* to bar Ellizzette from testifying regarding the existence of a marital relationship, alleging that such testimony was barred by the Dead Man's Act (735 1LCS 5/8-201 (West 2016)). On October 23, 2019, Ellizzette filed an appearance on her own behalf, and a week later, on October 30, 2019, Ellizzette filed a response to Shawn's motion *in limine*, arguing that the plain text of section 8-201(d) of the Dead Man's Act provides that "[n]o person shall be barred from testifying as to any fact relating to the heirship of a decedent." *Id.* § 8-201(d). Ellizzette also attached an affidavit by Raymond Bement, who was named on the marriage certificate as the officiant. On November 4, 2019, Shawn filed a reply to Ellizzette's response along with a motion to strike Bement's affidavit, contending that the affidavit was in direct conflict with testimony Bement gave at his deposition. On November 13, 2019, the trial court entered an order granting Shawn's motion *in limine* and barring Ellizzette from testifying at trial.

¶ 35    On the day of trial, Monday, November 18, 2019, Ellizzette appeared in court and requested a continuance. She sought to postpone the trial to "December 3, 2019, or later," explaining that on the previous Friday she had unsuccessfully attempted to contact the judge's chambers. She stated that she spoke with someone from the clerk's office who advised her that she would have to come to court to request a

continuance. Accordingly, Ellizzette submitted her motion for a continuance in court.

¶ 36 In the motion, Ellizzette alleged that she had good cause for requesting an extension, because (1) her father had been hospitalized in Arizona and declared "end of life," (2) her mother, whom she categorized as a "key witness," would be unable to attend the trial due to the status of Ellizzette's father, (3) Ellizzette's attorneys withdrew from the case due to the "high outstanding balance" of attorney fees that Ellizzette was unable to pay because she was involved in an automobile accident that resulted in significant out-of-pocket medical expenses but that she now had resolved, hoping they would be allowed to reenter the case, and (4) she was unable to subpoena two "key witnesses." Shawn objected to the motion, arguing that it had been a year since the matter was first set for trial.

¶ 37 In response to questioning by the court, Ellizzette explained that the two "key witnesses" were both paraplegics who lived in Colorado and, due to their disability, could not be required to travel to Illinois to testify. Ellizzette did not make an offer of proof as to what their testimony would be but admitted that they were not witnesses to the marriage ceremony.

¶ 38 The court denied Ellizzette's motion for a continuance, finding *inter alia* that Ellizzette failed to show that the unavailable witnesses' testimony would be material to the issues in the case. The bench trial commenced with Ellizzette proceeding *pro se*. Prior to hearing evidence, the court asked for clarification on what issues were currently before it. Shawn's attorney responded that Ellizzette had abandoned her petition for letters of administration and the only matter before the court was Ellizzette's claim that she was John's surviving spouse and sole heir. Ellizzette made no assertions to the contrary, and the trial then proceeded on the matter of heirship.

¶ 39 Ellizzette called three witnesses. The first witness was Diane Boyer, who testified that she had known John and Ellizzette for about three years but that her main interaction with John occurred in November or December of 2017, when John lived with her for two weeks due to a protective order issued by the guardianship court that physically separated John and Ellizzette temporarily. Boyer testified that, on one occasion, she went to a court hearing in the contested guardianship case to verify that John and Ellizzette had recently married and, in her opinion, should not

- 12 -

be kept apart. However, Boyer also testified that she did not witness the marriage ceremony, though she was involved in preparations for the marriage and took John and Ellizzette out to a "wedding dinner" three or four days after the wedding to celebrate.

¶ 40 Ellizzette next called Dr. Visar Belegu, who testified that he was a scientist residing in Baltimore, Maryland. Belegu also testified that he first met Ellizzette in 2004, when he initially began working with John in St. Louis. It is unclear how long his initial affiliation with John lasted; however, Belegu testified that he phoned or texted John at least once each week in 2017 and that he traveled with John in the summer of 2017, because they were working on a project together. Belegu also testified that a research paper he and John had been working on "for quite a while" was submitted and accepted for publication in a major scientific journal sometime at the end of 2017 or early 2018, and it was Belegu's understanding that John had accepted a position that was to begin in 2018, working "on an international level."

¶ 41 Belegu testified that he did not attend John and Ellizzette's wedding but knew they were engaged and learned, on September 11, 2017, that they married. In response to questions by Ellizzette, Belegu testified that he was aware that John had been involved in guardianship proceedings in July 2017. On cross-examination Belegu testified that he did not know the exact date that the guardianship order was entered but believed it was sometime in July 2017. Belegu also admitted that he never attended any of the guardianship proceedings and did not know the contents of any reports prepared by the examining physicians, though he knew that John was upset about what the doctors said about him.

¶ 42 Ellizzette's final witness was Raymond C. Bement. On direct examination, Bement testified that he first met John and Ellizzette (whom he knew as Lisa) when they were all in college together in 1982 and was aware that she and John had a relationship in the mid-1980s. Bement further testified that he reconnected with Ellizzette in 2015, but he was not sure whether she was in a relationship with John at that time. In 2017, he learned that John and Ellizzette were engaged when John told him. He then helped them prepare for the marriage ceremony, which he officiated.

¶ 43 Bement further testified that there were actually two wedding ceremonies. He said he performed the "legal ceremony" on July 11, 2017, in John and Ellizzette's

Paris, Illinois, home and then signed the marriage certificate at their kitchen table. After that ceremony, the three of them went to Allerton Park in Monticello (Piatt County) for the "secular" portion of the ceremony. It is unclear what Bement meant by "secular ceremony." During Ellizzette's questioning of Bement, she referred to the ceremony in Paris as the "interfaith" ceremony and the ceremony in Monticello as the "religious" ceremony. Neither of the ceremonies was described in detail, and there were no witnesses at either location.

¶ 44　　On cross-examination, it was established that Bement was employed as a licensed clinical social worker and that he had very little contact with either John or Ellizzette from 2000 to 2016. There was some suggestion that Bement may have known John in his professional capacity while John was receiving mental health services, but that was not definitively established.

¶ 45　　Bement was questioned extensively about the affidavit he provided to Ellizzette, which was notarized in New York. Initially, Bement refused to say why the affidavit was notarized in New York, but he later claimed he had traveled to New York on a "date" and took the affidavit with him. He did not explain how he found a notary in New York, nor could he explain why the notary's certification was dated 2026.

¶ 46　　Bement further testified on cross-examination that he offered to be the officiant for John and Ellizzette's marriage when he learned, sometime in 2017, that John and Ellizzette were engaged. To that end, he obtained an online certification from Universal Life Church Ministry, a process that took him about 5 to 10 minutes. When asked about the marriage certificate he had signed, Bement admitted that he did not realize it listed Ellizzette's name as Ellizzette Duval Minnicelli and admitted he never knew her by that name. When asked if he was aware that Ellizzette claimed to be born in Lyon, France, he responded, "That's news to me."

¶ 47　　During redirect examination, Ellizzette attempted to clarify Bement's testimony; however, nearly every question she asked was objected to on grounds of "leading," "not relevant," or "beyond the scope." In fact, throughout the trial, Ellizzette, as a self-represented litigant, failed to frame her questions appropriately, opening her up to constant objections from opposing counsel. Though the court tried to assist her by explaining its rulings, answering her questions, and instructing

- 14 -

her to "rephrase," Ellizzette would typically engage in a long explanation, telling the court what she was "trying to establish."

¶ 48        When Ellizzette completed her questioning of Bement, she informed the court that she had no further witnesses. Shawn then moved for a directed finding, which the trial court granted. In so ruling, the court stated that the issue was the "validity of the marriage, the ceremony, the contract, and whether such a marriage—if it was conducted according to Illinois law or could have been conducted under the Probate Act when it happened—if it happened." The court then stated that the minimum relevant evidence necessary to establish a *prima facie* case of a valid marriage was "a valid application for a marriage license, a ceremony performed in Edgar County and witnessed by two witnesses." The court then concluded that, as a matter of law, Ellizzette did not present a *prima facie* case of a valid marriage. Specifically, the court held that the marriage was not properly witnessed nor licensed and that no best-interest determination was made by the probate court. The court entered an order granting a directed finding in Shawn's favor and included Rule 304(a) language. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). Ellizzette filed her notice of appeal on December 18, 2019.

¶ 49        On appeal, Ellizzette raised five issues. First, she argued that the trial court erred when it appointed Shawn as the administrator of decedent's estate because she was not provided with statutorily required notice. Second, she maintained that the trial court erred in denying her motion for a continuance on the day of trial. Third, she argued that the trial court erred in denying her motion for judgment on the pleadings. Fourth, she claimed that the trial court committed reversible error in barring her from testifying regarding her marriage and heirship. Finally, she contended that the trial court erred in granting Shawn's motion for a directed finding.

¶ 50        The appellate court affirmed in part, reversed in part, and remanded for further proceedings. 2020 IL App (2d) 191113. In sum, the appellate court affirmed the trial court's denial of Ellizzette's motion to vacate the order granting Shawn letters of administration, affirmed the denial of Ellizzette's motion for continuance, and affirmed the denial of Ellizzette's motion for judgment on the pleadings. However, the appellate court reversed the trial court's ruling on Shawn's motion *in limine* that

barred Ellizzette from testifying and reversed the grant of a directed finding in favor of Shawn. *Id.* ¶ 106.

¶ 51 The matter was remanded for further proceedings, and Shawn filed a petition for leave to appeal in this court, which we granted.

¶ 52                                                    ANALYSIS

¶ 53 On appeal to this court, Shawn, in his capacity as administrator of John's estate, raises three issues. First, he contends that the appellate court erred when it reversed the circuit court's grant of a directed finding on the ground that a best interest determination was not required prior to John marrying Ellizzette. Second, Shawn argues that the appellate court erred when it reversed the circuit court's grant of a directed finding, because Ellizzette failed to establish her actual identity. And last, Shawn contends that the appellate court erred when it found that the Dead Man's Act did not bar Ellizzette from testifying and that she was substantially prejudiced by her inability to testify.

¶ 54 In her reply brief, Ellizzette seeks cross-relief, arguing that the trial court erred when it granted Shawn's petition for letters of administration and declaration of heirship and that the appellate court erred when it declined to review those orders.

¶ 55                                          STANDARD OF REVIEW

¶ 56 The parties agree that the trial court's grant of a directed finding, based on its determination that Ellizzette failed to present a *prima facie* case on the validity of the marriage, is a matter to be reviewed by this court *de novo*. See *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). As to the trial court's ruling on the motion *in limine* based on its finding that the Dead Man's Act barred Ellizzette from testifying, Shawn contends that our review is for an abuse of discretion (*People v. $5,608 United States Currency*, 359 Ill. App. 3d 891 (2005)) and that the ruling should not be reversed unless the error was substantially prejudicial and affected the trial's outcome (*In re Estate of Goffinet*, 318 Ill. App. 3d 152, 156 (2001)).

¶ 57 While acknowledging that a ruling on a motion *in limine* is generally reviewed for an abuse of discretion, Ellizzette argues that the issue presented here concerns the trial court's interpretation of the Dead Man's Act, which is a question of law subject to *de novo* review.

¶ 58 Having considered the positions of both parties, we find that the applicable standard for our review of the matters presented in this appeal is *de novo*.

¶ 59 I. Legal Capacity to Marry—
Necessity of a Best Interest Hearing

¶ 60 In his first issue, Shawn argues that the appellate court erred when it rejected the trial court's finding that, pursuant to section 11a-17(a-10) of the Probate Act (755 ILCS 5/11a-1(a-10) (West 2016)), John, as a ward subject to plenary guardianship, lacked the capacity to marry without first seeking a judicial finding that the marriage was in John's best interest. In addressing this issue, we look first to the provisions of the Probate Act concerning wards who have been found to be disabled and in need of plenary guardianship.

¶ 61 Article XIa of the Probate Act (*id.* art. XIa) sets forth the rules and requirements governing the appointment of guardians for adults with disabilities, as well as the duties of the guardian so appointed. In section 11a-2, the Probate Act defines a " '[p]erson with a disability' " as follows:

" 'Person with a disability' means a person 18 years or older who (a) because of mental deterioration or physical incapacity is not fully able to manage his person or estate, or (b) is a person with mental illness or a person with a developmental disability and who because of his mental illness or developmental disability is not fully able to manage his person or estate, or (c) because of gambling, idleness, debauchery or excessive use of intoxicants or drugs, so spends or wastes his estate as to expose himself or his family to want or suffering, or (d) is diagnosed with fetal alcohol syndrome or fetal alcohol effects." *Id.* § 11a-2.

¶ 62 A guardian may be appointed for an adult with disabilities pursuant to section 11a-3 of the Probate Act, which at that time stated, in pertinent part:

- 17 -

"(a) Upon the filing of a petition by a reputable person ***, the court may adjudge a person to be a person with a disability, but only if it has been demonstrated by clear and convincing evidence that the person is a person with a disability as defined in Section 11a-2. If the court adjudges a person to be a person with a disability, the court may appoint (1) a guardian of his person, if it has been demonstrated by clear and convincing evidence that because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person, or (2) a guardian of his estate, if it has been demonstrated by clear and convincing evidence that because of his disability he is unable to manage his estate or financial affairs, or (3) a guardian of his person and of his estate.

(b) Guardianship shall be utilized only as is necessary to promote the well-being of the person with a disability, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence. Guardianship shall be ordered only to the extent necessitated by the individual's actual mental, physical, and adaptive limitations." *Id.* § 11a-3.

¶ 63    In the version of section 11a-17 in effect at the time, the Probate Act described the duties of a guardian, stating in pertinent part:

"(a) To the extent ordered by the court and under the direction of the court, the guardian of the person shall have custody of the ward ***. ***

(a-5) If the ward filed a petition for dissolution of marriage under the Illinois Marriage and Dissolution of Marriage Act before the ward was adjudicated a person with a disability under this Article, the guardian of the ward's person and estate may maintain that action for dissolution of marriage on behalf of the ward. Upon petition by the guardian of the ward's person or estate, *the court may authorize and direct a guardian of the ward's person or estate* to file a petition for dissolution of marriage or to file a petition for legal separation or declaration of invalidity of marriage under the Illinois Marriage and Dissolution of Marriage Act on behalf of the ward if the court finds by clear and convincing evidence that the relief sought is in the ward's best interests. In making its determination, the court shall consider the standards set forth in subsection (e) of this Section.

(a-10) Upon petition by the guardian of the ward's person or estate, *the court may authorize and direct a guardian of the ward's person or estate to consent, on behalf of the ward, to the ward's marriage pursuant to Part II of the Illinois Marriage and Dissolution of Marriage Act if the court finds by clear and convincing evidence that the marriage is in the ward's best interests*. In making its determination, the court shall consider the standards set forth in subsection (e) of this Section. Upon presentation of a court order authorizing and directing a guardian of the ward's person and estate to consent to the ward's marriage, the county clerk shall accept the guardian's application, appearance, and signature on behalf of the ward for purposes of issuing a license to marry under Section 203 of the Illinois Marriage and Dissolution of Marriage Act.

\* \* \*

(e) Decisions made by a guardian on behalf of a ward shall be made in accordance with the following standards for decision making. Decisions made by a guardian on behalf of a ward may be made by conforming as closely as possible to what the ward, if competent, would have done or intended under the circumstances, taking into account evidence that includes, but is not limited to, the ward's personal, philosophical, religious and moral beliefs, and ethical values relative to the decision to be made by the guardian. Where possible, the guardian shall determine how the ward would have made a decision based on the ward's previously expressed preferences, and make decisions in accordance with preferences of the ward. If the ward's wishes are unknown and remain unknown after reasonable efforts to discern them, *the decision shall be made on the basis of the ward's best interests as determined by the guardian*." (Emphases added.) *Id.* § 11a-17(a), (a-5), (a-10), (e).

¶ 64    Reading these provisions as a whole and giving them consistent, harmonious, and sensible effect, we conclude that, under the Probate Act, a ward who wishes to enter into a marriage may do so only with the consent of his guardian. Pursuant to section 11a-17(a-10) (*id.* § 11a-17(a-10)), for a guardian to obtain the ability to consent, he must file a petition with the court. If the court finds by clear and convincing evidence that the marriage is in the ward's best interest, the court may then authorize and direct the guardian to consent to the ward's marriage. When making its best interest determination, the court must follow the standards set forth

in subsection (e), which means that the court must rule in conformity with the ward's preferences unless the court believes that the marriage would result in substantial harm to the ward's welfare or personal or financial interests.

¶ 65 We believe this interpretation of the above-cited provisions of the Probate Act is in keeping with our decision in *Karbin v. Karbin*, 2012 IL 112815, ¶ 45, wherein we held that it is the policy of this state that, once a person is found to be "disabled" under our Probate Act, he or she is viewed as " ' "a favored person in the eyes of the law" and is entitled to vigilant protection' " (quoting *In re Mark W.*, 228 Ill. 2d 365, 374-75 (2008), quoting *In re Estate of Wellman*, 174 Ill. 2d 335, 348 (1996)). This policy is fulfilled through the creation of a guardianship, which will "promote the well-being of the person with a disability, [and] to protect him from neglect, exploitation, or abuse." 755 ILCS 5/11a-3(b) (West 2016).

¶ 66 Ellizzette argues, and the appellate court held, that the plain language of the Probate Act does not require a best interest hearing before a ward may marry. Moreover, Ellizzette contends that the validity of a marriage is governed by section 301 of the Marriage Act, which provides:

"The court shall enter its judgment declaring the invalidity of a marriage (formerly known as annulment) entered into under the following circumstances:

(1) a party lacked capacity to consent to the marriage at the time the marriage was solemnized, either because of mental incapacity or infirmity or because of the influence of alcohol, drugs or other incapacitating substances, or a party was induced to enter into a marriage by force or duress or by fraud involving the essentials of marriage[.]" 750 ILCS 5/301(1) (West 2016).

¶ 67 Further, Ellizzette contends that this court has consistently held that "the appointment of a guardian of a person is not sufficient, in and of itself, to show that the person was incompetent to have consented to marriage," citing *Pape v. Byrd*, 145 Ill. 2d 13 (1991). We reject Ellizzette's arguments and find her reliance on *Pape* to be misplaced.

¶ 68 In *Pape*, we held:

"We agree *** that the appointment of a guardian of a person is not sufficient, in and of itself, to show that the person was incompetent to have consented to a marriage. In this regard, we note that section 11a-3 of the Probate Act of 1975 provides, *inter alia*, that a court may adjudge a person disabled and may appoint a guardian of his person if, because of his disability, he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person. In contrast, section 301 of the Marriage Act provides that a declaration of invalidity of a marriage may be obtained where a party, *inter alia*, lacked the capacity to consent to the marriage because of, *inter alia*, mental incapacity or infirmity. (Ill. Rev. Stat. 1989, ch. 40, par. 301.) Moreover, a person lacks capacity to consent to a marriage where he is unable to understand the nature, effect, duties and obligations of marriage. (*Larson v. Larson* (1963), 42 Ill. App. 2d 467, 473.) It is thus clear that the test of incapacity in each of the foregoing provisions is limited and does not speak to the incapacity required for purposes of the other provision. Moreover, Illinois case law recognizes the difference between the types of incapacity involved in each provision." *Id.* at 21-22.

¶ 69      As recognized in *Pape*, the Probate Act identifies various types of disabilities that could give rise to the need for the appointment of a guardian, who has control over the disabled adult's person and estate. Accordingly, if a person is adjudged a disabled person in need of a guardian under the Probate Act, that person is limited in his ability to enter into a marriage, *i.e.*, such person must obtain the guardian's consent, which is given upon the court's authorization and direction after a determination that the marriage is in the ward's best interest. Under the Probate Act, the lack of capacity to enter into a marriage is based on the ward's failure to comply with the provisions for obtaining consent, not because the ward lacked the mental competence to understand the nature, effect, duties, and obligations of marriage.

¶ 70      *Pape* is factually distinguishable from the case at bar. In *Pape*, Jean A. Pape, as plenary guardian of Simpson Driskell Jr., a disabled adult, filed a petition to declare invalid the purported marriage between Driskell and Wilma Louise Byrd. *Id.* at 15-16. Byrd then filed a petition in probate court to have Pape removed as Driskell's guardian. *Id.* at 16. Pape's petition to declare the marriage void was found to be untimely. *Id.* at 25. However, Pape was permitted to challenge the validity of the

marriage in response to Byrd's petition to remove Pape as guardian. *Id.* at 28-29. After hearing the evidence, the trial court held that the marriage was invalid because Driskell lacked the mental capacity to enter into the marriage and that decision was affirmed on appeal. *Id.* at 19.

¶ 71    The appellate court noted that medical evidence showed that Driskell was diagnosed with "organic brain syndrome," schizophrenia, and Alzheimer's disease. *In re Driskell*, 197 Ill. App. 3d 836, 845 (1990). In addition, Driskell, who had numerous physical impairments, was found to have an IQ of 38 and was described as being "unable to know what he was doing." *Id.* Several nurses who had attended Driskell at hospitals or nursing homes around the time of the marriage testified that Driskell was difficult to work with, unable to dress or clean himself, and often required restraint. *Id.* Under these circumstances, the court held that the applicable test to determine whether Driskell was competent to marry was whether he had the ability to understand the nature, effect, duties, and obligations of marriage. The court then found Driskell was not competent to enter into the marriage. *Id.* at 846. Significantly, Pape was appointed Driskell's guardian *after* the purported marriage ceremony took place. See *Pape*, 145 Ill. 2d at 17. Consequently, the question of whether consent of the guardian and a best interest hearing were required prior to the marriage was not at issue.

¶ 72    *Larson v. Larson*, 42 Ill. App. 2d 467 (1963), cited by *Pape* regarding the test for determining competency, is also factually distinguishable. In *Larson*, the husband, Sydney, filed a petition in 1956 to annul his marriage to Myrtle, which took place six years earlier in 1950. *Id.* at 468. Sydney contended that the marriage was invalid because Myrtle was insane at the time of the marriage and, therefore, incapable of contracting marriage pursuant to section 2 of the Marriage Act as it existed in the 1950s (Ill. Rev. Stat. 1953, ch. 89, ¶ 2).

¶ 73    The *Larson* court ruled that, while

"there is no clear dividing line between competency and incompetency, and each case must be judged by its own peculiar facts; the parties must have sufficient mental capacity to enter into the status, but proof of lack of mental capacity must be clear and definite; if the party possesses sufficient mental capacity to understand the nature, effect, duties, and obligations of the marriage contract into which he or she is entering, the marriage contract is binding, as

long as they are otherwise legally competent to enter into the relation." *Larson*, 42 Ill. App. 2d at 473.

In *Larson*, no guardian was involved. Prior to the marriage, Myrtle was not determined to be a disabled adult under the Probate Act, and she was never appointed a plenary guardian to oversee her person or estate.

¶ 74       Based on the above, we reject Ellizzette's argument that John's competency to marry is governed by section 301 of the Marriage Act and that, to prove the validity of the marriage it was only necessary to show that John understood the nature, effect, duties, and obligations of the marriage contract into which he entered.

¶ 75       In the case at bar, Ellizzette brought suit, seeking to be named the sole heir of John's estate as John's surviving spouse. Therefore, it was Ellizzette's burden to prove her status as heir by proving that she and John entered into a valid marriage. The validity of the marriage was challenged by Shawn, as administrator of John's estate, based on the contention that John was a ward under the plenary guardianship of Shawn and, as such, John lacked the capacity to enter into a valid marriage without the authorization and consent of his guardian granted by the court after a finding that the marriage was in John's best interest. We agree.

¶ 76       Under the facts of this case, we find that John's capacity to marry is governed by the Probate Act. Applying our interpretation of the provisions of the Probate Act, we further find that, for John to have the legal capacity to enter into a valid marriage, he had to obtain the consent of his guardian, Shawn, given upon the authorization and direction of the court after a best interest determination. Thus, for Ellizzette to meet her burden of proving a valid marriage to John, she would have to show that, prior to the marriage, the court authorized and directed Shawn to consent to the marriage upon a finding that the marriage was in John's best interest.

¶ 77       Turning to the record, we must review the evidence Ellizzette presented at trial to determine whether she met her burden of proving that her marriage to John was valid. First, however, we must determine whether the trial court erred when it granted Shawn's motion *in limine* and barred Ellizzette from testifying, and whether, as the appellate court held, the trial court's ruling substantially prejudiced Ellizzette's ability to present her case.

¶ 78                                II. The Dead Man's Act

¶ 79        In this case, the trial court granted Shawn's motion *in limine* and barred Ellizzette from testifying at trial regarding her marriage and heirship, based on its finding that section 8-201 of the Code of Civil Procedure, commonly referred to as the Dead Man's Act (735 ILCS 5/8-201 (West 2016)), precluded such testimony. In so ruling, the trial court relied on our decision in *Laurence v. Laurence*, 164 Ill. 367 (1896). On appeal, the appellate court reversed the trial court's ruling, finding, *inter alia*, that *Laurence* is no longer good law. 2020 IL App (2d) 191113, ¶ 83.

¶ 80        Before this court, Shawn argues that the appellate court erred when it found that *Laurence* was no longer good law. Shawn directs our attention to Illinois Rule of Evidence 101 (eff. Jan. 6, 2015), which states: "A statutory rule of evidence is effective unless in conflict with a rule or a decision of the Illinois Supreme Court." Shawn then contends that, because the Dead Man's Act is a statutory rule of evidence that is "in conflict" with our decision in *Laurence*, *Laurence* still controls. We disagree.

¶ 81        When *Laurence* was decided, the Dead Man's Act provided:

> "No party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the *** heir *** of any deceased person, *** unless when called as a witness by such adverse party so suing or defending ***." Ill. Rev. Stat. 1895, ch. 51, ¶ 2.

¶ 82        Our decision in *Laurence* was based on our interpretation and application of the Dead Man's Act as it then existed. Subsequently, however, in 1973, the Dead Man's Act was repealed and replaced. The successor act now reads, in pertinent part:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person

- 24 -

under legal disability or to any event which took place in the presence of the deceased or person under legal disability, except in the following instances:

* * *

(d) No person shall be barred from testifying as to any fact relating to the heirship of a decedent." 735 ILCS 5/8-201(d) (West 2016).

¶ 83 No conflict exists between this statutory rule of evidence and our decision in *Laurence* because we were not interpreting this new language of the Dead Man's Act when we decided *Laurence*. In *In re Estate of Babcock*, 105 Ill. 2d 267, 272-73 (1985), we applied the successor act and observed that the legislature had made it "less restrictive" by adding language that "no longer bar[red] all testimony by interested persons." See also *In re Estate of Bailey*, 97 Ill. App. 3d 781, 784 (1981) (section 2(4) of the Dead Man's Act (Ill. Rev. Stat. 1979, ch. 51, ¶ 2(4)) was "intended to change the rule of *Laurence*"); *In re Estate of Hutchins*, 120 Ill. App. 3d 1084 (1984). Based on the above, we are compelled to agree with the appellate court below that the trial court erred when it granted Shawn's motion *in limine* and barred Ellizzette from testifying.

¶ 84 Although we find that the trial court erred, our inquiry is not over. Shawn argues here, as he did in the appellate court, that even if it was error for the trial court to have barred Ellizzette from testifying, the error was not properly preserved for review. Shawn contends that an adequate offer of proof, which informs the trial court, opposing counsel, and the reviewing court of the exact nature and substance of the evidence sought to be introduced, is necessary to preserve a trial court's alleged error in excluding evidence. *Colella v. JMS Trucking Co. of Illinois*, 403 Ill. App. 3d 82, 93 (2010); see also *Snelson v. Kamm*, 204 Ill. 2d 1, 23 (2003). Because Ellizzette failed to make any offer of proof, Shawn maintains that she failed to preserve for review the trial court's error in granting the motion *in limine* that barred her from testifying.

¶ 85 The appellate court, while acknowledging that no offer of proof was made by Ellizzette, held that an offer of proof is not required where it was apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced. See *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002). The court then rejected Shawn's claim that the trial court's error was not preserved for review,

stating, "[g]iven this record, *** the trial court understood that Ellizzette would testify as to her purported marriage to decedent." 2020 IL App (2d) 191113, ¶ 85. The court then went on to conclude that Ellizzette was substantially prejudiced by her inability to testify and, therefore, remand for a new trial was required. *Id.* ¶ 86. We disagree.

¶ 86    It is certainly true that an offer of proof need not be made if it is clear that the trial court understood the nature and character of the evidence that would have been offered had Ellizzette been allowed to testify. However, we do not find it clear from the record in this case what Ellizzette's exact testimony "as to her purported marriage to decedent" would be. Moreover, the issue in this case was not simply whether a marriage ceremony took place but whether the marriage was legally valid. Shawn alleged, and we have now determined, that the validity of the marriage and John's capacity to enter into the marriage are dependent upon proof that a court determined, based on clear and convincing evidence, that the marriage was in John's best interest. We find nothing to indicate that Ellizzette intended to present testimony to dispute Shawn's allegations, nor does it appear that Ellizzette could have presented testimony that would have established the validity of the marriage. Thus, we find that, not only did Ellizzette fail to preserve the error by failing to make an offer of proof, but any testimony that Ellizzette might have offered could not have established John's capacity to enter into a valid marriage.

¶ 87    Ellizzette was aware at the time the marriage took place that, as a result of guardianship proceedings, John was under the plenary guardianship of Shawn and, for that reason, the marriage might not be valid. It is also clear from the record that no best interest finding was ever sought or made. In light of our holding in this opinion that a disabled person lacks the capacity to marry unless a court authorizes and directs that person's guardian to consent to the marriage after a best interest finding, Ellizzette could not have provided any testimony that would have been sufficient to prove the validity of the marriage. Consequently, Ellizzette could not have been prejudiced by her inability to testify regarding the marriage.

¶ 88    Thus, we reverse the appellate court's finding that Ellizzette was substantially prejudiced by her inability to testify. The error occasioned by the trial court's ruling that barred Ellizzette from testifying was harmless. Accordingly, remand for a new trial is not necessary.

¶ 89                                  III. Directed Finding

¶ 90        As noted above, the trial court granted Shawn's motion for a directed finding after ruling that Ellizzette failed to present a *prima facia* case regarding the validity of her marriage to John. The trial court so ruled based, in part, on the ground that, pursuant to the Probate Act, a best interest hearing was required before John could marry.

¶ 91        The appellate court reversed the directed finding in Shawn's favor, finding *inter alia* that a *prima facie* case had been presented. The appellate court concluded that the trial court erred in granting a directed verdict in favor of Shawn on the grounds it set forth. *Id.* ¶ 90. The appellate court found that Ellizzette had presented some evidence that a ceremony was performed in Edgar County through Bement's testimony and that the trial court erred when it held that section 11a-17(a-10) of the Probate Act required a prior best interest hearing or the court's consent before John could validly marry. *Id.* ¶ 102.

¶ 92        Because we have found that a best interest hearing was required before John could validly marry, we reverse the appellate court's holding and affirm the trial court's grant of a directed verdict in favor of Shawn.


¶ 93                                     CONCLUSION

¶ 94        Based on our findings above, we reverse the appellate court judgment and affirm the circuit court's grant of a directed finding in favor of Shawn McDonald, as representative of the estate of John W. McDonald III.


¶ 95        Appellate court judgment reversed.

¶ 96        Circuit court judgment affirmed.


¶ 97        JUSTICE THEIS, concurring in part and dissenting in part:

¶ 98    In this heirship proceeding, we are tasked with reviewing the circuit court's order granting Shawn McDonald's motion for a directed finding because Ellizzette McDonald failed to present a *prima facie* case that her marriage to John McDonald was valid. The majority holds that she failed to do so because the lack of a judicial determination that the marriage was in John's best interest rendered the marriage void under section 11a-17(a-10) of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-17(a-10) (West 2016)). I disagree with that holding because it conflicts with the plain language of section 11a-17(a-10) and is in contravention of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2016)). Additionally, while I agree with the majority's holding that the circuit court erred in denying Ellizzette the right to testify regarding the existence of her marital relationship under section 8-201 of the Code of Civil Procedure (735 ILCS 5/8-201 (West 2016)), I disagree with their conclusion that she failed to preserve the error because she did not make an offer of proof. No offer of proof was necessary because it was clear that she would be testifying regarding the circumstances surrounding her purported marriage. For these reasons, I concur in part and dissent in part.

¶ 99    Before addressing the merits of this case, I note that much of the majority's extensive background discussion concerns matters that were neither presented at trial nor formed a basis for the circuit court's order under review. See *supra* ¶¶ 6-51. In the process, the majority has highlighted certain allegations against Ellizzette. To the extent that these claims were even relevant to the issue at trial, she did not testify or present evidence regarding them. Although Shawn argues before this court that the circuit court's grant of a directed finding was proper because Ellizzette failed to establish her actual identity, the circuit court did not make that factual determination, and it was not a basis for its ruling.

¶ 100    Rather, the facts necessary to resolve this appeal are limited. On May 30, 2017, Shawn was appointed John's plenary guardian. On December 11, 2017, John died intestate. Ellizzette subsequently filed a petition for letters of administration, an affidavit of heirship, and a motion for judgment on the pleadings. She asserted that, as John's surviving spouse, she was his sole heir because he had no children. Prior to trial, the court granted Shawn's request to take judicial notice of three certified documents: John and Ellizzette's application for a marriage license in Edgar County, the marriage license, and a certificate of marriage.

¶ 101 In November 2019, the matter proceeded to a bench trial on Ellizzette's petition. The evidence centered on the validity of her purported marriage to John on July 11, 2017. Pursuant to the circuit court's pretrial order, Ellizzette was barred from testifying regarding the circumstances of her relationship with John and the existence of any marital relationship between them.

¶ 102 Ellizzette, proceeding *pro se*, called three witnesses. Diane Boyer testified regarding her involvement in the preparations for the wedding. Dr. Visar Belegu, one of John's colleagues, testified that he had frequent weekly contact with John in 2017 and thought that John and Ellizzette were happily married. Raymond Bement, a licensed clinical social worker, testified that he participated in preparations for and performed a marriage ceremony between Ellizzette and John in their home in Edgar County on July 11, 2017. Later that day, the three of them went to a park in Monticello, Illinois, for a second ceremony.

¶ 103 At the close of Ellizzette's case-in-chief, the circuit court granted Shawn's motion for a directed finding on the validity of the marriage. The circuit court found that Ellizzette had not made a *prima facie* case of a valid marriage because (1) she presented no evidence that the purported marriage was properly licensed, (2) there was no evidence of two witnesses to the marriage, and (3) there was no best-interest hearing to determine John's competency to marry.

¶ 104 The appellate court methodically rejected each of these findings; it remanded for further proceedings because genuine issues of fact existed as to whether Ellizzette was decedent's surviving spouse and sole heir. 2020 IL App (2d) 191113.

¶ 105 As a threshold matter, although Shawn was appointed John's plenary guardian in May 2017, this case does not concern John's protection under the guardianship. The Probate Act directs that a guardianship "shall be utilized only as is necessary to promote the well-being of the person with a disability, to protect him from neglect, exploitation, or abuse, and to encourage development of his maximum self-reliance and independence." 755 ILCS 5/11a-3(b) (West 2016). It is well settled that in all instances, the guardian is to act in the ward's "best interests." *Id.* § 11a-17(e); see also *Karbin v. Karbin*, 2012 IL 112815, ¶ 21. Under the Probate Act, however, the guardianship ended upon John's death. See 755 ILCS 5/24-12 (West 2016). Thus, rather than relating to John's protections under the guardianship, this case concerns the proper distribution of John's assets because he died intestate.

Additionally, Shawn is a party in this case not as John's guardian but, rather, as a potential heir along with his parents and siblings.

¶ 106    The central issue in this appeal is whether the circuit court erred in holding that Ellizzette had failed to make a *prima facie* case of a valid marriage because, under section 11a-17(a-10) of the Probate Act, a best-interest determination is required before an individual subject to a plenary guardianship is permitted to marry.

¶ 107    Our framework is a familiar one. The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. The most reliable indicator of that intent is the language of the statute itself. *Id.* If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory interpretation. *Id.* A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 37-38 (2009).

¶ 108    Section 11a-17(a-10) of the Probate Act provides:

"Upon petition by the guardian of the ward's person or estate, the court may authorize and direct a guardian of the ward's person or estate to consent, on behalf of the ward, to the ward's marriage pursuant to Part II of the Illinois Marriage and Dissolution of Marriage Act if the court finds by clear and convincing evidence that the marriage is in the ward's best interests. In making its determination, the court shall consider the standards set forth in subsection (e) of this Section. Upon presentation of a court order authorizing and directing a guardian of the ward's person and estate to consent to the ward's marriage, the county clerk shall accept the guardian's application, appearance, and signature on behalf of the ward for purposes of issuing a license to marry under Section 203 of the Illinois Marriage and Dissolution of Marriage Act." 755 ILCS 5/11a-17(a-10) (West 2016).

¶ 109    The majority acknowledges this statutory provision but chooses to dodge the language itself. Instead, after quoting section 11a-17 in its entirety, the majority simply concludes that, "under the Probate Act, a ward who wishes to enter into a marriage may do so only with the consent of his guardian" and "[p]ursuant to

section 11a-17(a-10) [(755 ILCS 5/11a-17(a-10) West 2016))], for a guardian to obtain the ability to consent, he must file a petition with the court." *Supra* ¶ 64.

¶ 110    The plain language of section 11a-17(a-10), however, does not mandate prior approval by the court before a ward can marry of his or her own accord. The provision begins "[u]pon petition by the guardian" and then provides that "the court may authorize and direct a guardian *** to consent, on behalf of the ward, to the ward's marriage *** if the court finds *** that the marriage is in the ward's best interests." 755 ILCS 5/11a-17(a-10) (West 2016). Thereafter, the section states that, "[u]pon presentation of a court order authorizing and directing a guardian of the ward's person and estate to consent to the ward's marriage, the county clerk shall accept the guardian's application." *Id.*

¶ 111    The plain language of section 11a-17(a-10), as the appellate court recognized, merely provides a procedure to allow a guardian to petition the court for authorization to consent, on behalf of a ward, to the ward's marriage following a best-interest determination. Among other reasons, a guardian may seek such a court order for ease of meeting the requirements of the Marriage Act on behalf of his or her ward who is marrying or to prevent a subsequent challenge that his or her ward lacked, for purposes of the Marriage Act, the capacity to consent to the marriage. The fact that the provision permits a guardian to seek an order allowing consent from the court does not mean the legislature intended that a ward's marriage would be invalid unless the guardian first obtained the court's approval. The appellate court was correct that nothing in the plain language of section 11a-17(a-10) provides that a marriage entered into by a ward without his or her guardian's consent, or following a judicial determination of best interest, is void.

¶ 112    The majority extraordinarily holds that the Marriage Act does not govern in a case centered on whether a couple was legally married in Illinois. See *supra* ¶ 76. The majority ignores the obvious; the Marriage Act specifically addresses the requirements and formalities that a couple must fulfill to be legally married in Illinois. See 750 ILCS 5/101 *et seq.* (West 2016). None of those requirements reference section 11a-17(a-10) of the Probate Act or suggest that a ward must have the consent of his or her guardian after a court hearing on best interest to enter into a valid marriage in Illinois.

¶ 113    The Marriage Act does, however, provide a clear process by which a court may declare a marriage invalid when it is shown, *prior to a ward's death*, that he or she lacked the capacity to consent to the marriage because of mental incapacity or infirmity.

¶ 114    Section 301 of the Marriage Act provides, in pertinent part:

"Declaration of invalidity—Grounds. The court shall enter its judgment declaring the invalidity of a marriage (formerly known as annulment) entered into under the following circumstances:

(1) a party lacked capacity to consent to the marriage at the time the marriage was solemnized, either because of mental incapacity or infirmity or because of the influence of alcohol, drugs or other incapacitating substances, or a party was induced to enter into a marriage by force or duress or by fraud involving the essentials of marriage[.]" *Id.* § 301.

¶ 115    Section 302 of the Marriage Act then specifies, in pertinent part:

"Time of commencement. (a) A declaration of invalidity under paragraph[ ] (1) *** of Section 301 may be sought by any of the following persons and must be commenced within the times specified:

(1) for any of the reasons set forth in paragraph (1) of Section 301, by either party or by the legal representative of the party who lacked capacity to consent, no later than 90 days after the petitioner obtained knowledge of the described condition;

* * *

(b) *In no event* may a declaration of invalidity of marriage be sought *after the death of either party to the marriage* under subsection[ ] (1) *** of Section 301." (Emphases added.) *Id.* § 302.

¶ 116    The Marriage Act unambiguously requires that any challenge by a guardian to his or her ward's competency to consent to marriage because of mental incapacity or infirmity occur no later than 90 days after the guardian obtained knowledge and "in no event" after the ward's death. By reading language into section 11a-17(a-10) of the Probate Act and in complete contravention of the Marriage Act, the majority

is allowing a marriage to be declared invalid after the death of a party to the marriage; the majority is doing indirectly what the Marriage Act clearly prohibits. See *Accettura v. Vacationland, Inc.*, 2019 IL 124285, ¶ 11 (a court may not alter the plain meaning of a statute's language by reading into it exceptions, limitations, or conditions not expressed by the legislature). The majority's erroneous ruling renders void any marriage in Illinois that has been entered into since August 26, 2014, by a ward with a plenary guardian who did not first receive a court order authorizing and directing the guardian to consent to the ward's marriage. See Pub. Act 98-1107, § 5 (eff. Aug. 26, 2014) (adding 755 ILCS 5/11a-17(a-10)). The majority fails to acknowledge the very serious impact of this holding on such couples, including those who may have had a child following what they had every reason to believe was a valid marriage in Illinois.

¶ 117    While not addressed by the majority, the circuit court provided two additional reasons for granting Shawn's motion for a directed verdict that were also erroneous. First, the court erroneously found there was no evidence that the purported marriage was properly licensed. Second, the court erroneously found that two witnesses to the marriage were required for it to be valid.

¶ 118    Section 2-1110 of the Code of Civil Procedure provides that, in all cases tried without a jury, a defendant may, at the close of the plaintiff's case, move for a finding or judgment in his favor. 735 ILCS 5/2-1110 (West 2016). In ruling on such a motion for a directed verdict, the trial court must determine, as a matter of law, whether the plaintiff has presented a *prima facie* case. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154-55 (1980). A plaintiff establishes a *prima facie* case by proffering at least some evidence on every element essential to the underlying cause of action. *Id.* at 154.

¶ 119    As previously recognized, to legally marry in Illinois, a couple must fulfill the requirements and formalities set out in the Marriage Act. See 750 ILCS 5/101 *et seq.* (West 2016). Section 201 of the Marriage Act provides that "[a] marriage between 2 persons licensed, solemnized and registered as provided in this Act is valid in this State." *Id.* § 201. The parties must apply for a marriage license from the county clerk's office of the county in which they intend to marry. *Id.* §§ 203, 207. The parties must then appear before a duly authorized officiant and, after

consenting to marry, must file the marriage certificate with the county clerk's office within 10 days after the marriage is solemnized. *Id.* § 209.

¶ 120 The circuit court found that Ellizzette, a self-represented litigant, failed to present a *prima facie* case of a valid marriage, in part, because there was no evidence that her purported marriage was properly licensed. In doing so, the court stated,

> "It would have been simple to present the evidence of a marriage license and certificate and application and have some witnesses testify about that, but that was not done."

¶ 121 This finding overlooked the fact that the court already had evidence of a marriage application, license, and certificate because it had previously granted Shawn's motion to take judicial notice of these certified documents. Because the circuit court had taken judicial notice of these three documents for purposes of the trial, there was no need for Ellizzette to reintroduce them. Consequently, the circuit court erred in holding that there was no evidence that the purported marriage was properly licensed.

¶ 122 Similarly, the circuit court erred by holding that Ellizzette had not made a *prima facie* case based on a lack of evidence of two witnesses to the marriage ceremony of which Raymond Bement testified he officiated at the couple's home in Edgar County. Simply put, no provision in the Marriage Act requires the presence of two witnesses for a marriage to be valid in Illinois, so that rationale could not form a basis either for granting Shawn's motion for a directed finding.

¶ 123 Finally, I agree with the majority that the circuit court erred when it granted Shawn's motion *in limine*, barring Ellizzette from testifying regarding the marriage and heirship. The circuit court's erroneous ruling was based on its conclusion that section 8-201 of the Code of Civil Procedure (735 ILCS 5/8-201 (West 2016)), commonly referred to as the Dead Man's Act, precluded her testimony. As the majority finds, section 8-201(d) specifically provides that "[n]o person shall be barred from testifying as to any fact relating to the heirship of a decedent." *Id.*

¶ 124 I disagree, however, with the majority's conclusion that Ellizzette failed to preserve the error by not making an offer of proof. "The purpose of an offer of

proof is to inform the trial court, opposing counsel, and a reviewing court of the nature and substance of the evidence sought to be introduced." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002). This court has long held that "an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced." *Id.* (citing *People v. Peeples*, 155 Ill. 2d 422, 457-58 (1993), *In re A.M.*, 274 Ill. App. 3d 702, 709 (1995), and Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 103.7, at 23-24 (7th ed. 1999)). Here, an offer of proof was not necessary because it was clear that Ellizzette would be testifying regarding the circumstances surrounding her purported marriage to John, which was the core issue at trial.

¶ 125 For the reasons stated, the circuit court erred in barring Ellizzette from testifying and in granting Shawn's motion for a directed finding, and I would remand this matter to the circuit court for further proceedings. Accordingly, I respectfully concur in part and dissent in part.

¶ 126 JUSTICES OVERSTREET and CARTER join in this partial concurrence, partial dissent.